Rondal D. and Darla A. CAIN, and
Mark Cain, Plaintiffs,

v.

YUKON PUBLIC SCHOOLS, DISTRICT
I–27, and State of Oklahoma, ex rel.
State Board of Education, Defendants.

Civ. A. No. CIV–81–152–SF.

United States District Court,
W.D. Oklahoma.

Feb. 3, 1983.

R. Dean Rinehart, Rinehart, Rinehart &
Rinehart, El Reno, Okl., Reed Martin, Austin, Tex., for plaintiffs.

John E. Wheatley, Wheatley & Joplin,
Yukon, Okl., Jan Eric Cartwright, Oklahoma Atty. Gen., John F. Percival, Kay Harley Jacobs, Asst. Attys. Gen., Oklahoma
City, Okl., for defendants.

MEMORANDUM AND ORDER

SAFFELS, District Judge, Sitting by
Designation.

This is an appeal, authorized by 20 U.S.C.
§ 1415(e)(2), as amended by the Education

For All Handicapped Children Act of 1975, from an adverse administrative ruling rendered on September 30, 1980, regarding the educational placement of plaintiff Mark Cain. Plaintiffs appealed to the State Department of Education. The State Department of Education affirmed the administrative decision on November 24, 1980, and it is from this decision that plaintiffs appeal to this court.

The case was tried to the undersigned judge, sitting by designation, on November 1 and 2, 1982. After consideration of the evidence and testimony, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Mark Cain is a mentally retarded and emotionally disturbed child as defined by The Education For All Handicapped Children Act, 20 U.S.C. § 1401 *et seq.* [hereinafter the Act].

2. Yukon Public School District I–27 is a recipient of federal funds and comes within the provisions of the Act, 20 U.S.C. § 1401 *et seq.*

3. Yukon Public School District I–27 has made the required assurances that they will abide by the regulations promulgated under the Act, 20 U.S.C. § 1401 *et seq.;* Section 504 of the Rehabilitation Act of 1973; and 29 U.S.C. §§ 794 and 794a.

4. The Act requires that handicapped students be at all times offered a free and appropriate public education under the continuing direction of an individual educational program [hereinafter IEP plan].

5. In September, 1979, plaintiff Mark Cain was enrolled in the Yukon School District pursuant to an IEP plan and placed in a high school class for the educable, mentally handicapped [hereinafter EMH] during the mornings and in an area vocational-technical school in the afternoons.

6. The EMH program at the vocational-technical school involved a thirty-day observation period. Plaintiff Mark Cain had several emotional outbursts while riding on the school bus. After three or four weeks at the vocational-technical school, Mark Cain was expelled because of disruptive behavior.

7. Following Mark Cain's expulsion, he was returned to the Yukon School District for schooling.

8. Subsequent to the experience at the vocational-technical school, Mark continued to engage in disruptive emotional outbursts. Seven or eight of these outbursts occurred, and Mark Cain was suspended from school for three days after each incident. Each suspension was pursuant to the IEP established by defendants and Mark Cain's parents or occurred with the consent of the parents. These outbursts disrupted Mark Cain's classes and interfered with the schooling of the other students in Mark Cain's class.

9. In lieu of vocational-technical classes, defendants assigned Mark Cain to custodial clean-up work on the school grounds. This activity was not mentioned in Mark Cain's IEP.

10. There was no change in the individual educational program for Mark Cain to address his behavior problem after many repeated suspensions from the Yukon Schools. A new IEP was written for Mark Cain in March of 1980 as part of the pre-enrollment for the 1980–1981 school term.

11. On April 2 or 3, 1980, Mark Cain engaged in an especially severe emotional outburst and was suspended. Although the exact nature of this outburst was never made clear, witnesses for both parties stated that Mark Cain's conduct that day disrupted the entire school.

12. The next day, Mark Cain's teacher, Ms. Sue Breshears, asked Mark Cain's mother to meet her in Ms. Breshears' office. Ms. Breshears told Mrs. Cain that Mark Cain was not going to be allowed to return to school and that "we will have to work something else out."

13. A meeting was held between Mark Cain's parents and the school personnel on April 8, 1980, and it was decided, because of Mark's disruptive behavior, that the mainstream classroom setting for Mark was

causing problems. A home-bound teacher was suggested at this meeting by the school, and the parents suggested a residential placement for Mark.

Mark Cain was eighteen years old at the time, and the parents were under the impression that state residential schools would not take a child of that age. The parents inquired about sending Mark to the Brown School in Austin, Texas. All school personnel were receptive to that idea.

Mr. Cain suggested the school district pay for Mark's expenses at the Brown School pursuant to Public Law 94–9492, and Mr. Corn, the Director of Testing and Services agreed to look into the matter.

14. The school officials informed the parents that Mark Cain would not be allowed to return to school until his behavioral and emotional problems were brought under control.

15. The school district proposed sending a teacher to the Cain residence to teach Mark. The parents rejected that idea because they felt Mark would benefit from being in school with other children.

16. The meeting adjourned without anything definite being decided about Mark's future. No new IEP was submitted to the Cains.

17. Following the April 2, 1980, suspension, defendant provided Mark with no further educational services.

18. In late May, 1980, the Cains requested a due process hearing under the applicable regulations, however, this request was subsequently withdrawn.

19. Mark Cain was carried on the school rolls as an enrolled student until the end of the spring, 1980 term, notwithstanding the fact that he did not attend classes.

20. On August 25, 1980, the Cains arrived at school to enroll Mark Cain in the Yukon Public Schools. They were advised by School Counselor Betty Novak that the school did not have a program for Mark Cain.

21. Because of the Cains' failure to pre-enroll Mark, there had been no program created for Mark Cain as of August 25, 1980. The Cains went to Mr. Corn's office to discuss the matter. Mr. Cain read Mr. Corn a series of prepared questions concerning the school district's plans for Mark's education during the fall term.

22. Partially in response to these prepared questions, and partially at a loss to respond, Mr. Corn told Mr. Cain that the school district could not grant the Cains' request for a Multiple Handicapped/Emotionally Disturbed combination program at that time because the school district had not hired a teacher for such a program. Mark Cain was the only student in the school district who would have been enrolled in such a class.

23. Mr. Cain gave Mr. Corn until September 3, 1980, to draw up a plan for Mark's education. Mr. Corn again suggested that Mark Cain's IEP be constructed around a homebound program, which meant that Mark would be taught at home by Ms. Sue Breshears. The Cains rejected this proposal. The Cains felt Ms. Breshears was not addressing Mark's problems. They felt she sometimes deviated from Mark's IEP without consulting them or the school administration.

24. On August 25, 1980, the Cains were of the opinion that the school district was required by law to provide them with a written proposed IEP, including a full day schedule and behavior modification program; anything less was not acceptable to them.

25. On August 28, 1980, Mr. Corn met in his office with Mr. Simon, the Yukon school psychologist who had been working with Mark on a weekly basis, and Mr. Glen Herring, of the State Board of Education. Mr. Herring assented to establishing an Emotionally Disturbed Program for Mark at Yukon School, even though it would be expensive.

26. On September 3, 1980, Mr. Corn called Mr. Cain to arrange a meeting to discuss Mark's IEP. Mr. Corn offered to set up an Emotionally Disturbed Program for Mark, but Mr. Cain said the program was not acceptable because Yukon Schools

had not yet hired a teacher for the program. Mr. Corn replied that all he could do was advertise for a teacher and set up a program. Mr. Corn told Mr. Cain that it would not be reasonable to hire a teacher and set up a program for Mark before he knew whether or not such a program would be acceptable to the Cains.

27. After the telephone conversation, the Cains made arrangements to enroll Mark Cain at the Brown School in Austin, Texas.

28. On September 5, 1980, the Cains requested a Due Process Hearing. A meeting was set in Mr. Corn's office for September 16, 1980.

29. The Cains enrolled Mark Cain in the Brown School on September 8, 1980. They did not inform the Yukon School District of this enrollment.

30. On September 16, 1980, the Cains met with Mr. Corn. No written IEP was offered at that time. Mr. Corn admitted that he had not hired a teacher for an Emotionally Disturbed program. Mr. Corn once again offered to set up such a program for Mark. Mr. Corn's suggestion included a one-on-one program with counseling by the school psychologist.

The Cains demanded a written IEP, a behavior modification program and a report on the teacher, including the teacher's experience and qualifications. The Cains said that they would not make a decision on the program until these materials were before them in written form.

Mr. Corn said that he was scheduled to interview a teacher for the program that afternoon. The teacher was not yet certified to teach such a program, but Mr. Corn promised to see that she received a temporary certificate to allow her to teach Mark pending her official credentials. This teacher was not acceptable to the Cains because of her lack of experience and lack of certification.

31. Mr. Corn would not hire a teacher until Mark Cain was formally enrolled. The Cains would not enroll Mark until a teacher was hired and a written IEP ten-dered to them. The parties were deadlocked.

32. Mr. Corn felt that the Cains had rejected the offer of an Emotionally Disturbed Program. Had the Cains accepted the offer, the program could have been instituted within a reasonably short period of time.

33. On September 16, 1980, Mr. Corn learned for the first time that Mark Cain was enrolled in the Brown School.

34. Brown School is a private, residential facility offering 24-hour care and education for handicapped children with behavior problems.

35. The Brown School performed a comprehensive evaluation of Mark Cain and developed a program which addressed his disruptive behavioral problem.

36. The Cains requested the Yukon School District pay for the Brown School placement, but such request was refused. The Cains have incurred the entire expense of Mark's education in the amount of One Hundred Four Thousand Four Hundred Seventy-Seven and 94/100 Dollars ($104,477.94).

37. A due process hearing was conducted on September 30, 1980, and a decision adverse to the Cains was entered. An appeal followed, but relief was denied. The appeal to this court resulted.

## DISCUSSION

The Education For All Handicapped Children Act, 20 U.S.C. § 1401 et seq., provides federal funds to state and local school districts conditioned upon the school district agreeing to comply with stated goals and procedures. In order to receive funds under the Act, a state must implement a policy which "assures all handicapped children the right to a free, appropriate public education." 20 U.S.C. § 1412(1). "Handicapped children" is broadly defined under the Act, and Mark Cain is a handicapped child under the definition found at 20 U.S.C. § 1401(1).

The appropriate public education requirement is based in large part upon the "indi-

vidualized educational program" [IEP] required for every handicapped student by 20 U.S.C. § 1414(a)(5). An IEP is produced from a meeting of each child's teacher, parents, a member of the school administration, and, where appropriate, the child. The IEP is a written document containing:

"... (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." 20 U.S.C. § 1401(19).

The Act requires prior written notice to the parents or guardian of a child whenever a specified educational agency proposes to initiate or change the educational placement of a child. 20 U.S.C. § 1415(b)(1)(C).

Upon complaint, the parents of a handicapped child have a right to a due process hearing at which they may be heard concerning their child's placement and education. If the due process hearing is conducted by a local or intermediate educational agency or unit, a person aggrieved by the decision has the right to appeal to the state educational agency, which is required to conduct an impartial review and to render an independent decision. 20 U.S.C. § 1415 (c).

The decision thus rendered is final, subject to the right to appeal to a court of competent jurisdiction, including a federal district court. 20 U.S.C. § 1415(e).

When a parent wishes to contest the child's educational placement, the Act requires that the student remain in his current placement during the pendency of the due process proceedings. 20 U.S.C. § 1415 (e)(3) provides:

"During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed."

■ The regulations promulgated under this section also provide that a child's placement may not be changed during the pendency of the hearings and appeals provided in the Act. 34 C.F.R. § 300.513. The statute and the regulations create a duty on the part of parents who avail themselves of the hearing and review provisions of the Act to keep their children in their current placement while the hearings and appeals are proceeding. Under this statutory and regulatory framework, the parents have no right, absent an agreement with the educational authorities, to elect unilaterally to place their child in a private school and recover the tuition costs. *Anderson v. Thompson,* 658 F.2d 1205, 1206 (7th Cir. 1981); *Town of Burlington v. Department of Education of the Commonwealth of Massachusetts,* 655 F.2d 428 (1st Cir.1981); *Stemple v. Board of Education of Prince George's County,* 623 F.2d 893 (4th Cir. 1980); *Foster v. District of Columbia Board of Education,* 523 F.Supp. 1142 (D.D.C. 1981).[1]

Mark Cain was a student in the Yukon school system under an IEP in September, 1980, which provided, in part, for schooling at a vocational-technical school. After a short time in that school, he was expelled for disruptive behavior. Accepting plaintiffs' argument that this was a proposed change in Mark Cain's educational placement, his parents were entitled to written

---

**1.** During the due process procedure, however, the education officials may use their normal procedures for dealing with children who are endangering themselves or others. *See Comment* to 34 C.F.R. § 300.513.

notice of such change by 20 U.S.C. § 1415(b)(1)(C). It is, however, undisputed that the parents received actual notice of this action, and, in fact, acquiesced in it. The court therefore finds that defendants substantially complied with the requirements of law in regard to this transaction.

A new IEP was written for Mark Cain in March, 1980. Mark Cain's suspensions from school following each outburst were approved by the parents, but following the outburst and suspension of April 2 or 3, 1980, the subsequent indefinite suspension was not approved by the parents. It is undisputed that Mark Cain was not allowed to return to school following his conduct on that date. This is a proposed change in his educational placement, and his parents were entitled to receive prior written notice. However, it is undisputed that they received actual notice, and participated in a meeting with all concerned to work out a new educational plan for their son. The parents would not agree to the homebound program offered by defendant, and the defendant could not agree to paying for Mark Cain's expenses if placed in the Brown School without authorization from the Board of Education. The meeting was at a stalemate, and nothing further was possible.

Defendants could not unilaterally draw up an IEP without the parents. 20 U.S.C. § 1401(19). Therefore, Mr. Cain's repeated demands that the defendants do so were without legal foundation. The parents rejected defendants' reasonable proposals, and would not participate further until the defendants had reasserted their proposals in written form. This obviously would have been a useless act, and an act not required by law.

The due process procedures were instituted by the parents in May, 1980, but the hearing request was subsequently withdrawn. The due process procedures were again invoked by the parents on September 5, 1980. Despite participating in these procedures, the parents enrolled Mark Cain in the Brown School on September 8, 1980, without the knowledge of defendants, and contrary to 20 U.S.C. § 1415(e)(3).

The Act prohibits any change in a child's current placement once a due process proceeding under the Act has been initiated. *Monahan v. State of Nebraska,* 491 F.Supp. 1074, 1089 (D.Neb.1980), *aff'd.* 645 F.2d 592 (8th Cir.1981). As of September 5, 1980, the date the Cains requested a due process hearing, Mark Cain's educational placement was that of an admitted student who had not completed enrollment in the defendant school district for the current year. His IEP of March, 1980, was still in effect. Mark's subsequent enrollment in the Brown School was contrary to law and bars plaintiffs' claims for the cost of tuition at the Brown School.

It is difficult to deny feelings of compassion and sympathy for parents and children in the position of plaintiffs. Plaintiffs' predicament was made obvious as the case proceeded, and their frustration was justified to some extent. Nevertheless, defendants have the right to expect that parents will not resort to self-help except in the most exceptional cases:

"... Self-help may be sanctioned, indeed requisite, in some exceptional cases, with unique factual occurrences, where the parent has exhausted all other avenues for relief or other considerations of justice compel it...." *Foster v. District of Columbia Board of Education, supra,* 523 F.Supp. at 1146.

In this case, however, the parents had not exhausted "all other avenues for relief;" in fact, they had barely begun the due process procedures when their son was enrolled in the private school. Similarly, the court is not persuaded that "other considerations of justice" require the defendants to pay for the cost of tuition at Brown School.

The court may not substitute its judgment for that of the state officials on questions concerning the methodology of Mark Cain's education or the qualifications of his teachers. Our inquiry is limited:

"... [A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures

set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? ...

"In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States...." *Board of Education of the Hendrick Hudson Central School District, et al., v. Rowley,* —— U.S. ——, —— ——, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982).

In our view of the record, the court finds that the state substantially complied with the procedures set forth in the Act, and that no prejudice resulted to plaintiffs from any lack of technical perfection in defendants' compliance. The court further finds nothing to indicate that Mark Cain's IEP was not reasonably calculated to result in educational benefits at all pertinent times.

Plaintiffs also bring this cause of action on the basis that defendants have discriminated against Mark Cain in violation of 29 U.S.C. § 794, which provides that no qualified person be excluded from participation in any program receiving federal financial assistance solely by reason of a handicap.

Section 794 constitutes an across-the-board requirement of nondiscrimination in all federally-assisted programs. *New Mexico Association for Retarded Citizens v. State of New Mexico,* 678 F.2d 847, 852 (10th Cir.1982).[2] This section is of no aid to plaintiffs however. The regulations promulgated pursuant to 29 U.S.C. § 794 provide, in part:

"If a recipient [of Federal financial assistance] has made available ... a free appropriate public education to a handicapped person and the person's parents ... choose to place the person in a private school, the recipient is not required to pay for the person's education in the private school...." 45 C.F.R. § 84.-33(c)(4).

This regulation is fatal to plaintiffs' cause of action under 29 U.S.C. § 794. The court holds that Mark Cain was receiving a free appropriate education; therefore, defendants are under no legal obligation to pay for his education in a private school.

Furthermore, the regulations promulgated pursuant to 29 U.S.C. § 794 provide that disputes between parents and recipients regarding a person's free appropriate public education must be resolved by procedures which ensure compliance with the mandates of due process. Compliance with the procedures set forth in 20 U.S.C. § 1415 meet this requirement and are satisfactory in this case. *See* 45 C.F.R. § 84.36.

Plaintiffs seek an award of attorney's fees pursuant to 29 U.S.C. § 794a(b). That section authorizes an award of attorney's fees to prevailing parties other than the United States. Plaintiffs are not the prevailing parties in this lawsuit, therefore, the court will deny their application for attorney's fees.

## CONCLUSIONS OF LAW

1. Defendants substantially complied with the procedures set forth in the Act.

2. Mark Cain's IEP was developed within the Act's procedures, and was reasonably calculated to enable him to receive educational benefits.

3. Defendants provided Mark Cain with a free appropriate public education.

4. Plaintiffs are not entitled to relief under 29 U.S.C. § 794.

5. Plaintiffs are not entitled to an award of attorney's fees.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered in favor of the defendants and against the plaintiffs on their cause of action. Each party shall bear their own costs.

**2.** *Compare Anderson v. Thompson, supra* [the Education for All Handicapped Children Act was intended to be exclusive in its rights and remedies; no cause of action for attorney's fees under 42 U.S.C. § 1988].