Rondal D. CAIN, Darla A. Cain, and Mark Cain, Plaintiffs-Appellants,

v.

YUKON PUBLIC SCHOOLS, DISTRICT I-27, Defendant-Appellee.

No. 83–1445.

United States Court of Appeals, Tenth Circuit.

Oct. 12, 1985.

Reed Martin of Austin, Tex., and Dean Rinehart of Rinehart & Rinehart, Inc., El Reno, Okl., for plaintiffs-appellants.

John E. Wheatley of Yukon, Okl., for defendant-appellee.

Before BARRETT, BREITENSTEIN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This case presents the difficult question whether the parents of a handicapped child should be reimbursed for the cost of a private education for their child when they believe that the program proposed by their local school district is inappropriate.[1] Under the circumstances of this case, we agree with the district court that the program proposed by the school district was appropriate within the meaning of the Education for All Handicapped Children Act (EHA), 20 U.S.C. §§ 1400 et seq. (1982).[2] Accordingly, the parents must bear the financial responsibility for their child's private education.

## I.

The EHA, which provides federal money to assist state and local agencies in educating handicapped children, conditions such funding upon a state's compliance with numerous goals and procedures. *Board of Education v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). To qualify for federal financial assistance, a state must demonstrate that it "has in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). The free appropriate public education required by the Act is tailored to the unique needs of the handicapped child by means of an individualized education program (IEP), *see id.* § 1401(18), prepared at a meeting among a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child. *See id.* § 1401(19). The IEP contains an evaluation of the child's current educational level, a statement of annual goals, a statement of the specific educational services to be provided, a projected timetable of services, and objective evaluative criteria and procedures for determining whether objectives are being achieved. *See id. See generally Rowley*, 458 U.S. at 181–82, 102 S.Ct. at 3037–38.

The EHA also imposes extensive procedural requirements upon the state. Parents must be notified of proposed changes in the child's IEP and must be permitted to bring a complaint about any matter relat-

---

1. The district court opinion is reported at 556 F.Supp. 605 (W.D.Okla.1983).

2. Plaintiffs also originally sought damages under the Rehabilitation Act of 1973, § 504, as amended, 29 U.S.C. § 794 (1982). They abandoned this claim at oral argument in view of the Supreme Court's decision in *Smith v. Robinson,* — U.S. —, 104 S.Ct. 3457, 3474, 82 L.Ed.2d 746 (1984) ("[W]here ... whatever remedy might be provided under § 504 is provided with more clarity and precision under the EHA, a plaintiff may not circumvent or enlarge on the remedies available under the EHA by resort to § 504").

ing to the child's education. *See* 20 U.S.C. § 1415(b)(1). Complaints must be resolved at a due process hearing, from which the losing party may appeal to the state educational agency. *See id.* § 1415(b)(2) & (e). Thereafter, any aggrieved party may bring a civil action in federal district court. *See id.* § 1415(e). *See generally Rowley,* 458 U.S. at 182–83, 102 S.Ct. at 3038–39.

## II.

Mark Cain is a mentally retarded youth whose IQ has fallen at various times between the educational categories of "trainable mentally handicapped" and "educable mentally handicapped" (EMH). Mark has serious emotional problems which also hinder with his ability to learn. In 1979, when Mark was eighteen years old, the Cains enrolled him in the EMH program at Yukon High School, and an IEP was developed. As an attempt at disciplinary behavior modification, the parents and teacher agreed that Mark would be suspended for three-day intervals if he became unmanageable at school. Mark's original daily program included several hours in a vocational program at a local vo-tech school as well as three to four classroom hours at Yukon. He was also under the observation and guidance of the school psychologist.

Several weeks after the school year began, the vo-tech school expelled Mark from the program because of his outbursts. These outbursts similarly occurred during Mark's daily program at Yukon and, as agreed, Mark was suspended a number of times for three-day intervals. In addition, Mrs. Cain was frequently called to pick Mark up in the middle of the day. The outbursts usually involved disruptive behavior that on several occasions endangered other students.

Mark's teacher testified that the outbursts were precipitated both by Mark's frustration with his lack of ability and by any attention she gave to other students. As a result, she was forced to allocate her time disproportionately to Mark, which interfered with her ability to teach the six other students in the class. Throughout this period, she consulted frequently with Mrs. Cain and the school psychologist for alternative methods of behavior modification. She testified that she changed methods often while searching for an effective program, but the situation failed to improve.

On April 2, 1980, Mark had an outburst that disrupted over half the school. At that time, his teacher decided she could no longer handle him in the classroom and told Mrs. Cain that an alternative would have to be worked out. The Cains requested a meeting with school personnel, which took place several days later. All who testified about the meeting characterized it as an emotional one with a consensus that change was necessary. The school first proposed a "homebound" program, involving several hours of private instruction at home each week. The Cains rejected this proposal, believing that Mark needed to be around other children. The discussion then turned to various residential placements. The Brown School in Texas was mentioned, and the school psychologist offered to inquire about its services. When the meeting adjourned, no final decision had been reached.

During this period, Mark received no services. His teacher testified that she had planned a series of tests in late April for her students, including Mark, and that she expected the tests to help the school develop an appropriate program for Mark. Although she notified the Cains of the testing date, Mark did not appear for the tests. She testified that, when she contacted the Cains several days later, Mrs. Cain indicated that they might send Mark to the Brown School in Texas. Some weeks later, the Cains asked the teacher to write a letter to the Brown School concerning Mark's needs, which she did.

Mrs. Cain next contacted Yukon in May, after learning from the Brown School that many school districts paid the costs for students like Mark. She inquired whether Yukon would do the same for Mark. The answer was no. The Cains then requested a due process hearing, pursuant to section

1415(b)(2) of the EHA. Mr. Cain testified that they withdrew the request, on the advice of counsel, upon learning the name of the proposed hearing officer, believing that he was likely to find in favor of Yukon. They did not renew the request at that time.

On August 25, 1980, the Cains appeared at Yukon to enroll Mark. Because Yukon had not expected Mark to enroll, no program had been planned for him. The Director of Special Services, Leon Corn, offered to prepare a program and asked the Cains what services they felt that Mark needed. The Cains requested a multihandicapped program designed to accommodate Mark's mental retardation and his emotional problems. Because the school had no program for a combined mentally handicapped and emotionally disturbed child, Mr. Corn requested a week to develop one.[3]

Several days later, Mr. Corn received state permission to create such a program at Yukon especially for Mark. On September 3, Mr. Corn telephoned Mr. Cain to arrange a meeting to discuss Mark's IEP and informed him of the proposal to set up the program. Mr. Cain rejected it because Yukon had not yet hired a teacher. Mr. Corn pointed out that it would be unreasonable to hire a teacher and to set up a program for Mark before he knew whether such a program would be acceptable to the Cains. Again, nothing was resolved. After this phone call, the Cains made arrangements to enroll Mark in the Brown School without informing Yukon. Two days later, they again requested a due process hearing. In anticipation of the hearing, a final meeting was arranged with Mr. Corn for September 16. The Cains enrolled Mark in the Brown School on September 8.

At the September 16 meeting, Mr. Corn again offered a one-on-one combination program that would include individual counseling by the school psychologist. He admitted that he had not yet hired a teacher, but said that he planned to interview one that afternoon. Although the applicant had experience and was certified to teach EMH students, she had not yet been certified to teach the emotionally disturbed. Mr. Corn promised to see that she received a temporary certificate to allow her to teach Mark pending her official accreditation in the area of the emotionally disturbed. This situation was unacceptable to the Cains.[4] They believed that a program had not been properly developed, and Mr. Corn refused to hire a teacher until Mark was enrolled. As the district court pointed out, "[t]he parties were deadlocked." 556 F.Supp. at 608. The Cains then informed Mr. Corn that Mark had enrolled at the Brown School.[5]

The due process hearing was held on September 30 and resulted in a decision that the final program proposed by Yukon offered Mark a free appropriate education. That finding was affirmed by a state review board. Pursuant to section 1415(e)(2), the Cains sought judicial review of this decision and, after a two-day trial, the district court affirmed. The court found that Yukon had offered Mark an appropriate education and that, in any event, the parents were barred from reimbursement for the costs of Mark's education at the Brown School because of their unilateral action in entering him there. For the following reasons, we affirm.

### III.

Subsequent to the district court's ruling, the Supreme Court held that section

---

**3.** At this meeting, Mr. Corn again offered a homebound program to be taught by Mark's former teacher. The Cains rejected this proposal because of their dissatisfaction with the teacher's performance.

**4.** The Cains had previously demanded a written IEP and a behavior modification program, as well as a report on the teacher. Mr. Corn testi-

fied that he believed a written proposed IEP would not be appropriate because it is a program jointly developed by the parents, teacher, and administration.

**5.** Mark remained at the Brown School for two years, incurring expenses of $104,477.94.

1415(e)(2) of the EHA authorizes a reviewing court to order school authorities to reimburse parents for the cost of a private special education for their handicapped child if the court ultimately determines that such placement, rather than the program proposed by the local school district, is proper under the Act. *Burlington School Committee v. Department of Education,* —— U.S. ——, 105 S.Ct. 1996, 2002–03, 85 L.Ed.2d 385 (1985). Moreover, unilateral action by the parents in changing the current placement of the child, *see* § 1415(e)(3), does not constitute a waiver of the right to reimbursement. 105 S.Ct. at 2004. Thus, the critical question for our consideration is whether the district court's finding that the Yukon School District offered Mark Cain a free appropriate education is clearly erroneous. *See* Fed.R. Civ.P. 52(a). If it is not, the district court correctly ruled that Yukon need not reimburse the Cains for the cost of Mark's two years at the Brown School.

■ In determining whether the state has offered a free appropriate education under the EHA, a court must consider two questions: first, whether the state has complied with the procedures set forth in the Act; and second, whether the IEP developed through these procedures is reasonably calculated to enable the child to receive educational benefits. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3050–51. The two questions are interrelated because the statutory scheme reflects a legislative conviction that "adequate compliance" with the prescribed procedures would in most cases assure the desired substantive result. *Id.* at 206, 102 S.Ct. at 3050. Because of congressional emphasis upon procedures that guarantee the full participation of concerned parties throughout the development of the IEP, *see id.* at 205–06, 102 S.Ct. at 3050–51, the actual degree of parental participation in the development of Mark Cain's IEP provides the focal point of our inquiry.

## A. Procedural Compliance

The Cains assert a number of procedural defaults on the part of the school district. They cite numerous instances of Yukon's failure to provide proper notice of meetings or events that affected Mark's education. The district court found, however, that the Cains had received actual notice at relevant times and had either participated or concurred in the actions taken by Yukon. The record supports these findings. For instance, before Mark was expelled from the vo-tech school, Mrs. Cain acknowledged that she doubted Mark's ability to handle such a program. After the expulsion, Mark's teacher discussed the problem with Mrs. Cain, who acquiesced in the action. The teacher testified that she constantly sought new methods of controlling Mark's disruptive behavior, consulting frequently with both Mrs. Cain and the school psychologist, and that Mrs. Cain expressed satisfaction with her efforts. The continuing suspensions were imposed according to a behavior modification plan devised by the teacher in conjunction with Mrs. Cain.

The aftermath of the April 1980 decision that Mark could not remain in the EMH program evinces a breakdown in this mutual effort to provide an appropriate education for Mark, but it is difficult to place the blame entirely on the school. The Cains argue that Yukon failed to give notice of a change in Mark's placement and failed to develop a new IEP for him. Yet Mark's teacher personally informed Mrs. Cain of her inability to handle Mark in the EMH class. Several days later, the Cains, Mark's teacher, the school psychologist, and the Director of Special Services met to discuss alternatives for Mark's education. All agreed that the placement must be changed, but they reached no resolution of the problem. The Cains rejected the school's proposal of a homebound program. School personnel testified they were left with the impression that the Cains were considering a residential placement, but that Mark would first undergo scheduled

testing to indicate more clearly an appropriate placement. At that time, there was no reason for the school to develop a new IEP for Mark.

■ The same reasons explain the school's failure to have a program in place for Mark the following August. According to all indications, the Cains intended to enroll Mark in the Brown School. Although the parents had initiated a due process hearing in May, they subsequently withdrew this request. Upon learning in August of the Cains' apparent intention to enroll Mark at Yukon, the school obtained permission to create a special multi-handicapped program for Mark at the school, as requested by his parents, which could have been initiated within a reasonable time. The Cains claim that no program was actually offered because the school had neither proposed a written IEP nor hired a teacher. This objection overlooks both the school's good faith attempt to incorporate the requests of the parents and the school's legitimate dilemma of producing a written, detailed IEP without a teacher or parental cooperation. Despite the occasionally ad hoc nature of the school's efforts to provide Mark with a free appropriate education, we cannot find clearly erroneous the district court's determination that the response was adequate. *See Anderson v. City of Bessemer City,* —— U.S. ——, ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ More disturbing is the Cains' claim that Yukon failed to inform them of their rights under the EHA. The EHA places upon a school an affirmative responsibility to inform parents of their procedural rights under the Act. *See* 20 U.S.C. § 1415(b)(1)(D). The Cains claim that they were uninformed of these rights throughout the 1979–80 school year. It is clear, however, that they sought and received legal counsel by May 1980. At that time, they requested a due process hearing which would have resolved their complaints about the failure of the school to provide a free appropriate education for Mark. By

their own testimony, they abandoned this request. During the subsequent efforts to develop a program for Mark in September, including the due process hearing, the Cains again were well informed of their procedural rights. Through their informed efforts, the school developed and proposed a program that was ultimately judged appropriate. Had the Cains pursued their initial request for a hearing, perhaps the same program could have been solidly in place in time for fall enrollment. The choice to withdraw the initial request was strategic in nature, and, in light of the school's actual efforts to involve them in planning Mark's education, the Cains may not now complain of their earlier ignorance.

■ In their final procedural complaint, the Cains argue that the impartial hearing and review procedure required by section 1415(c) was flawed because the state review board was chaired by the State Director of Special Education, an employee of the state educational agency. The circuits are divided over whether the statute forbids state educational agency employees from sitting in review of a due process hearing conducted by a local educational agency. *Compare Grymes v. Madden,* 672 F.2d 321, 323 (3d Cir.1982) (per curiam), and *Helms v. McDaniel,* 657 F.2d 800, 806 n. 9 (5th Cir.1981), *cert. denied,* 455 U.S. 946, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982), *with Victoria L. v. District School Board of Lee County,* 741 F.2d 369, 374 (11th Cir.1984). We decline to consider this issue because the Cains have raised it for the first time on appeal. *See Colin K. v. Schmidt,* 715 F.2d 1, 5 (1st Cir.1983); *Nulf v. International Paper,* 656 F.2d 553, 559 (10th Cir.1981).

*B. Development of IEP*

We now turn to the second inquiry under *Rowley:* was the IEP developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

The Cains offered extensive testimony that Mark's program during the 1979–80 school year was inappropriate and that Mark received little benefit from the EMH program offered by Yukon. However inadequate this program may have been, the relevant question in this appeal is whether the program proposed in September 1980, which contemplated an individual multi-handicapped program conducted at school, was reasonably calculated to enable Mark to receive educational benefits. The district court found "nothing to indicate that Mark Cain's IEP was not reasonably calculated to result in educational benefits at all pertinent times." 556 F.Supp. at 611. Our review of the record indicates that this finding is not clearly erroneous. Although the Brown School undoubtedly offered Mark a superior educational program, an education which maximizes a child's potential is not required by the EHA. *See Rowley,* 458 U.S. at 197 n. 21, 199, 102 S.Ct. at 3046 n. 21, 3047.

Because we affirm the district court's determination that the Yukon School District offered Mark Cain a free appropriate education, his parents may not be reimbursed for the costs of his private education.

The judgment is affirmed.