Sarah KATTAN, by her parents and next friends, Susan J. THOMAS and Joseph Kattan, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al., Defendants.

Civ. A. No. 88–0630.

United States District Court, District of Columbia.

Aug. 9, 1988.

Patricia D. Douglass, Washington, D.C., for plaintiffs.

Joseph Kattan, Washington, D.C., pro se.

Earnest Franklin, Jr., Asst. Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff Sarah Kattan, a five-year-old multiply-handicapped child residing in the District of Columbia, is eligible for special education and related services pursuant to the Education for All Handicapped Children Act ("EHA"), 20 U.S.C. §§ 1400–1461. This action, brought pursuant to EHA, appeals the hearing officer's determination of February 23, 1988 that the Lafayette Non-categorical Pre–School Program ("Lafayette"), a District of Columbia public school program for handicapped children, was an appropriate placement for Sarah for the 1987–88 school year.[1] Plaintiffs also seek a permanent injunction:

(1) directing defendants to place and fund the minor plaintiff at Ivymount School ("Ivymount") and provide her with related services for the 1988–89 school year;

(2) prohibiting defendants from changing the minor plaintiff's educational placement for a period of two years without the express consent of her parents;

(3) prohibiting defendants from designating Hearing Officer Lois Hochauser to participate in any administrative hearing concerning the minor plaintiff;

(4) directing defendants to reimburse plaintiffs for their cost of securing testimony of expert witnesses in connection with the February 8, 1988 session of the administrative hearing; and

(5) directing defendants to provide and pay for speech and occupational therapy ("OT") for the minor plaintiff pending her placement in a special education program

---

**1.** The hearing officer found that Lafayette was the "least restrictive environment" for Sarah, Administrative Record ("AR") Exhibit ("Exh.") C at 8, and that "DCPS could, would and can provide OT [occupational therapy] for Sarah" at Lafayette. *Id.* at 6.

consistent with the terms of her Individualized Educational Program ("IEP").[2]

## I. *Factual Background*

On July 16, 1987, Sarah's parents submitted a Confidential Student Services Form to the District of Columbia Public Schools ("DCPS") requesting special education for the minor plaintiff. At the time, Sarah's parents had unilaterally placed Sarah at a private pre-school program, the D.C. Jewish Community Center ("DCJCC") Day Care, where she received outside speech and occupational therapy on a weekly basis. Sarah remained at the DCJCC for the 1987–88 school year. On October 26, 1987, DCPS completed an IEP for Sarah that identified her as multiply-disabled with specific deficits in the neuro-motor, sensory integration, speech and communication, socialization, and self-help areas and called for a full-time special education placement with special services.[3] On November 24, 1987, DCPS mailed a Notice of Proposed Change in Educational Placement ("Notice") to plaintiffs. The Notice, dated October 30, 1987, proposed placing Sarah at Lafayette.

On December 9, 1987, plaintiffs requested the first of two due process hearings pursuant to 20 U.S.C. § 1415(b)(2), claiming that DCPS's proposed placement was inappropriate and untimely. On January 25, 1988, the hearing was convened and the hearing officer determined that DCPS violated the applicable time period in placing Sarah. The officer did not, however, award plaintiffs their tuition expenses at DCJCC incurred pending the delayed placement. Subsequently, plaintiffs filed a motion for reconsideration of this determination.

At the second administrative hearing on February 8, 1988, the hearing officer considered the appropriateness of Lafayette and Sarah's current placement at the DCJCC. After this hearing, Hearing Officer Hochauser determined that Lafayette was appropriate[4] and that Sarah's current placement at the DCJCC was inappropriate because it could not meet the minor child's "special education needs and [could] not provide the services described in her IEP."[5] In addition, she found that although DCPS had violated the prescribed time frame in placing Sarah, DCPS was not required to fund Sarah's current placement because that placement was inappropriate. However, the hearing officer held DCPS financially responsible for Sarah's outside occupational and speech therapy because both therapies were appropriate and because DCPS had failed to abide by the time restrictions in providing these services.[6]

Plaintiffs now seek judicial review of the hearing officer's determinations. With the commendable cooperation of both parties, and in recognition of the importance of Sarah's needs and the imminence of the 1988–89 school year, this case has proceeded from the outset by expedited briefing and was promptly set for a final hearing on the merits. For the reasons set forth below the Court finds for plaintiffs on the two major issues presented—that Lafayette was not an appropriate placement for Sarah for the 1987–88 school year and that, commencing in September 1988, Sarah

**2.** On July 13, 1988, the Court granted plaintiffs' request for reimbursement of speech and occupational therapy services rendered from September 15, 1987 through May 31, 1988 in the amount of $4,275.00.

**3.** AR Exh. G. An IEP must include (a) the child's present levels of educational performance, (b) the annual goals (including short-term instructional objectives), (c) special education and related services to be provided to the child, (d) the projected dates for initiation of those services and the contemplated duration of those services, and (e) objective criteria and evaluation procedures and schedules for determining whether the short term instructional objectives are being achieved. 34 C.F.R. § 300.346. Sarah's IEP requires (1) an individual OT program of four half-hour sessions, two times a week, (2) fine and gross motor skill instruction, (3) speech and language therapy in half-hour sessions three times a week, (4) a program facilitating socialization, and (5) adaptive physical education once a week. AR Exh. G at 3a–3s. Sarah's IEP also encourages OT collaboration with requirements (2), (3), and (5).

**4.** *See supra* note 1.

**5.** AR Exh. C at 5.

**6.** *Id.* at 8.

must be placed and funded by DCPS at Ivymount.

## II. *Discussion*

■ The EHA entitles eligible handicapped children to receive a "free appropriate public education." 20 U.S.C. § 1412. A free appropriate public education is defined as "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3041–42, 73 L.Ed.2d 690 (1982). Although the EHA does not prescribe the level of education to be provided to the handicapped child and the state need not provide the "best possible" appropriate education, the education must nonetheless be appropriate for the child and conform to the child's IEP.[7] 20 U.S.C. § 1401(18).

■ After carefully reviewing the parties' extensive briefs, the evidence presented at the three and one-half day trial, including testimony from both parties' expert witnesses, and the parties' supplemental arguments, and giving "due weight" to the administrative record and expertise of the school officials responsible for Sarah's education, *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050–51, the Court concludes that it is beyond doubt and fully substantiated by far more than the preponderance of evidence[8] that Lafayette was not an appropriate placement for Sarah Kattan for the 1987–88 school year because DCPS did not provide the minor plaintiff with an integrated OT program at Lafayette, which was necessary to conform to her IEP and to permit Sarah to benefit from her special education program.[9] For similar reasons, it continues to be an inappropriate placement for this child for the imminent school year, 1988–89.

### A. *Lafayette*

The crucial contested issue regarding the appropriateness of Lafayette for Sarah is whether that program could fulfill the OT requirements of her IEP. Defendants claim that although DCPS did not offer an appropriate integrated program at Lafayette for the 1987–88 school year, DCPS could have and would have established such a program had Sarah enrolled at Lafayette in December 1987 or in February 1988 after the administrative hearing.[10] In essence, defendants argue that DCPS had the necessary OT equipment, available occupational therapists, and an adequate teacher at Lafayette to fulfill Sarah's IEP requirements.

Defendants presented the testimony of Nancy Milner, former Director of Itinerant Occupational/Physical Therapy Services for the District of Columbia Department of Human Services ("DHS") to support DCPS's contention that OT equipment was available in the Fall of 1987 to administer classroom OT to Sarah at Lafayette.[11] Defendants also assert that occupational therapists were available to treat Sarah in De-

---

7. *See also* 34 C.F.R. § 300.349 (the state or local educational agency "must provide special education and related services to a handicapped child in accordance with an individualized educational program").

8. EHA provides that the Court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of the party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

9. Sarah's IEP calls for an integrated program, *i.e.*, a program in which OT is provided in individual sessions and classroom sessions and in which the therapist consults and works with the classroom teacher to integrate OT concepts into Sarah's special education program. *See supra* note 3.

10. Patricia Pinkett, DCPS's Case Manager for Sarah Kattan, testified for the defendants that "DHS had in place a way of providing occupational therapy to Sarah." Trial Transcript ("Tr.") at 581. She went on to state that if Sarah had enrolled in December 1987, Pinkett would have "requested" an integrated OT program which could and would have been established. *Id.* at 585.

11. *Id.* at 233. Although DCPS did not actually move this equipment to Lafayette until February 1988, DCPS argues that such equipment could have been moved out of storage within an hour if Sarah had attended Lafayette. *Id.; see also* Plaintiffs' Exhibit ("PX") 45.

cember 1987. Joy Wills, Acting Coordinator for the Physical and Occupational Therapy Section of Handicapped Children's Services of DHS, testified that as of October 6, 1987, only three personal service contractors provided OT to all eligible students enrolled in DCPS schools outside the Sharpe Health School ("Sharpe") and that six to seven private providers administered OT to DCPS students during the 1987–88 school term.[12] Further, DCPS claims that Milner offered a contract to Valerie Dejean, Sarah's current occupational therapist, to furnish OT to Sarah in February 1988. Finally, defendants argue that Sarah's proposed Lafayette teacher, Angela Chestnut, was capable of integrating OT into Sarah's classroom program even though she lacked sensory integration training.[13]

The Court finds defendants' assertions of their ability to provide Sarah OT unsupported by the evidence. Plaintiffs have successfully demonstrated by a preponderance of the evidence that despite its claimed intentions, DCPS could not and would not have provided the minor plaintiff with an appropriate integrated program at Lafayette for the 1987–88 school year. Because DCPS has delegated to DHS its statutory responsibility to provide and pay for OT for DCPS students whose IEPs require OT, *DCPS* is completely incapable of providing OT to Sarah at Lafayette.[14] Contrary to defendants' claim, *DHS* was also unprepared to provide the appropriate OT for Sarah at Lafayette during the 1987–88 school year. DHS's severe financial constraints in the early fall of 1987 created significant contracting problems for their personal service contractors and private providers of OT from October 1987 to February 1988.[15] Additionally, and due to liability insurance considerations, DHS consistently maintained a policy of prohibiting private providers from administering OT to DCPS pre-school students at DCPS schools, even though the IEPs of many students like Sarah required integrated OT services.[16] Despite Milner's and Pinkett's expectations and efforts to establish an integrated OT program at Lafayette, Milner testified that neither DCPS nor DHS has ever realized such a program, either before, during the relevant time of October 1987 to February 1988, or at present.[17] Indeed, Milner further testified that she was not certain that this type of program would have been established for Sarah Kattan had she in fact enrolled at Lafayette.[18]

Even if DCPS had successfully set up an integrated program, the existence of lengthy waitlists of DCPS students needing and not receiving OT,[19] the complete lack

12. Tr. at 357–362; PX 5; *but see infra* note 20 and AR at 38–39. Milner indicated at trial that DHS has four methods of providing OT to eligible DCPS children: (1) DHS employees; (2) personal service contractors who directly contract with DHS; (3) occupational therapists from Metro Rehab Services; and (4) private providers who administer OT at their own facility and are paid by the child's parents, who are later reimbursed by DHS. Tr. at 280.

13. Chestnut testified that she has no experience in working with an occupational therapist to integrate OT techniques into her special education program. *Id.* at 345.

14. Dr. Paul Woods, Assistant Superintendent for Special Education–Local Education Agency, testified that DHS has the responsibility for providing occupational and physical therapy services for DCPS. DCPS "just recommend[s] to them what children need those services." *Id.* at 452, 458; *see also id.* at 220 (Milner).

15. *Id.* at 281. *See infra* note 20.

16. *Id.* at 614; AR at 49–50; Stipulation No. 55; *but see* Tr. at 578. Defendants urge the Court to

find that this restrictive policy was waived in Sarah's case. Defendants' argument is unconvincing in light of the fact that providing OT on Lafayette's premises had never before been authorized, that Milner had only begun the complicated authorization process in February 1988, and that Milner testified that authorization was "less likely" to occur in December 1987. Tr. at 288, 294; *see also* Stipulation No. 224; AR at 49–50; *but see* Tr. at 256, 456.

17. Tr. at 307–09.

18. *Id.* at 293, 309; *contra id.* at 585 (Pinkett).

19. The evidence, although incomplete and somewhat inconsistent, indicates that during the 1987–88 school year several hundred DCPS students were waitlisted for OT services. As of October 1987, 183 DCPS students outside of Sharpe, but including three students at Lafayette Elementary School, required OT but were not receiving it. PX 31; Stipulation Nos. 82, 83, 84. On November 2, 1987, 115 DCPS students outside Sharpe and The Handicapped Children Clinic needed OT and were not receiving it. PX

of funding for this service,[20] and the fact that DHS had only authorized an OT "evaluation" for the minor plaintiff and not the therapy itself,[21] convinces the Court that only sheer speculation would produce a belief that Sarah would have received such a program at Lafayette during the 1987–88 school year. Furthermore, plaintiffs' expert witness, Patricia Lemer, an educational diagnostician, testified that the teacher at Lafayette lacked the appropriate training in sensory integration dysfunction, Sarah's primary handicapping condition, necessary to integrate Sarah's OT into the classroom at Lafayette.[22] Finally, contrary to defendants' suggestion, the record clearly

demonstrates that DCPS did not have a concrete agreement with Dejean. Both Milner and Dejean testified that a contract was never reached on Dejean's employment by DHS to provide OT to Sarah at Lafayette.[23] Even if such a contract did in fact exist, DCPS offered Sarah only one and one-half hours of OT a week (in 45–minute sessions two times a week), while her IEP requires two hours of OT a week (in 30–minute sessions four times a week).

In light of the above factors, the Court concludes that DCPS's response to Sarah's IEP requirements was inadequate and that DCPS's proposed placement at Lafayette for the 1987–88 school year was inappropri-

---

29; Stipulation No. 85. (As of December 1987, only 10% of those *pre-school* students who required occupational and physical therapy services received them, and four children at Lafayette Elementary School who required OT were not receiving it. PX 23, 32; Stipulation Nos. 86, 88, 91.) As of February 10, 1988, 207 DCPS students outside Sharpe were waitlisted for OT services. PX 33; Stipulation No. 92.

In the Spring of 1988, the number of students requiring OT appeared to increase significantly. In March 1988, 347 DCPS students were waitlisted for OT services. Stipulation No. 95. (The trial testimony, however, suggests that this "waitlist" figure may represent all those students *requiring* OT, *i.e.*, it may include an unspecified number of students who were in fact *receiving* this required service. Tr. at 366–67 (Wills)). Of these 347 students needing OT, it is clear that 93 were pre-school students, 40 of whom received the service from DCPS; another 26 received OT at Sharpe; and the remaining 27 children were not receiving *any* therapy. Tr. at 368–69 (Wills). Indeed, two pre-school students then attending Lafayette who required OT did not receive this therapy from DCPS *at any time* during the 1987–88 school year. Tr. at 163–64 (Lemer), 335–37 (Chestnut); PX 61; Stipulation No. 224.

**20.** During the 1987–88 school year, DHS experienced severe contracting and funding problems with both personal service contractors and private providers of OT. Milner testified that from October 1987 to February 1988, DHS had funding problems with their main source of occupational therapists (personal service contractors) because DHS was "unable to provide payment to [its] staff regularly." Tr. at 281. Indeed, of the three occupational therapists providing OT to DCPS students outside Sharpe in October 1987, *only one* remained at DHS as of May 1988 and DHS lacked the funds to replace those who had left. *Id.* at 359 (Wills). Additionally, Dr. Leah Humphrey, DCPS Director of Special Edu-

cation, Region B, testified that as of April 6, 1988 (two months prior to the close of the 1987–88 school year), DHS did not have *any* funds available to compensate private providers of occupational or physical therapy evaluation and/or treatment for DCPS students. Tr. at 550–52; PX 58. This funding shortage continues today. Tr. at 550. Finally, Dr. Woods testified that "the public schools has a freeze on their money until October 1 [1988]." *Id.* at 466.

**21.** *See* PX 41, 42. Milner testified that DHS maintains a steadfast rule of never authorizing OT just based on an IEP. Instead, DHS reevaluates the child's needs to determine if in fact the service is needed. Tr. at 244.

**22.** *Id.* at 171; *but see id* at 300 (Milner). Lemer testified that "severe sensory integration dysfunction is the basis for [Sarah's] difficulties in all areas.... [U]nless sensory integration dysfunction is addressed, you are not going to see growth" in any of Sarah's other problem areas. *Id.* at 152–53; *see also* Deposition of Valerie Dejean ("Dejean") at 14.

**23.** AR at 45–47; Tr. at 301; Dejean at 28–38.

Unlike *Cain v. Yukon Public Schools, Dist. I–27*, 775 F.2d 15, 20 (10th Cir.1985), where the court found the proposed public placement for the handicapped child adequate because the school made a good faith attempt to have an appropriate program in place despite the parents' lack of cooperation, in this case the school's efforts to establish an integrated OT program were clearly inadequate, *ad hoc*, and not supported by budgetary or bureaucratic authority. Further, the Kattans in good faith considered the Lafayette option, were *not informed* by DCPS about the numerous practical and bureaucratic obstacles to providing integrated OT at Lafayette for Sarah, and did not seriously investigate private schools until the administrative hearing. *See* Tr. at 59, 66–67 (Thomas); *id.* at 586, 591 (Pinkett); Stipulation No. 123.

ate.[24] The record demonstrates that DCPS was incapable not only in December 1987 but also through February 1988 of providing an appropriate integrated OT program for Sarah at Lafayette.[25]

### B. *Ivymount*

Finding that Lafayette is not an appropriate educational placement for Sarah, the Court next considers evidence concerning alternative placement for this minor for the 1988–89 school year. It is evident that DCPS continues to be unprepared to provide Sarah with the type of integrated OT mandated by her IEP. DCPS's failure to provide OT services to Sarah, as well as other handicapped children in the District of Columbia who have required such services, is systemic and the result of apparently irreconcilable bureaucratic disarray, continuing contractual disputes, inability to attract occupational therapists, and total failure of funding. As noted above, defendants' argument that they would somehow have provided these necessary services to Sarah, making her, on the eve of the hearing, a singular exception to established policy, is entirely unpersuasive. Such potential relief was at best speculative, contrary to DCPS's own policy, and, most importantly, completely inadequate.

As an alternative to the placement proposed by DCPS, plaintiffs presented evidence reflecting that Ivymount, a private special education school in Rockville, Maryland, would be an appropriate placement for Sarah for the 1988–89 school year.[26] The testimony of plaintiffs' expert witness Patricia Lemer, familiar with Sarah's needs and the Ivymount program, and Lillian Davis, Assistant Director of Ivymount since 1973, strongly support the conclusion that the program would be appropriate for this child.[27] Ivymount specializes in children with severe sensory integration deficits and offers not only an integrated OT program but a classroom schedule that addresses the "specific needs that Sarah has, such as developing her oral motor skills, developing her gross motor skills. And the OT is present in the classroom with the classroom teacher so that it can be clearly a transdisciplinary approach."[28] This testimony was not refuted by defendants, nor was the evidence rebutted that DCPS's hearing officers have in the past ordered handicapped children who challenged DCPS's proposed public school placement to be placed at Ivymount with appropriate

---

**24.** Another hearing officer in an unrelated case found, in December 1987, that Lafayette did not provide an integrated program to DCPS preschool students. This Court does not adopt plaintiffs' argument that DCPS should be collaterally estopped from claiming that it could so provide integrated OT. Plaintiffs' Supplemented Closing Argument at 30. Nonetheless, such an administrative finding is strong evidence and supports the findings concerning Sarah and the general concern about the systemwide failure to provide such services to children who urgently need them.

**25.** Plaintiffs also assert that Lafayette was an improper placement because it failed to fulfill Sarah's socialization requirements as specified in her IEP. *See supra* note 3. The Court finds that DCPS failed to carry its burden of proof on this issue at the administrative hearing, as required by *Mills v. Board of Education of the District of Columbia,* 348 F.Supp. 866, 881 (D.D.C.1972), *as modified,* No. 1939–71, slip op. at 30 (D.D.C.May 3, 1978). Plaintiffs presented two witnesses, Sharon Strauss, Director of DCJCC, and Lynn Staubach, Sarah's speech therapist for two years, at the administrative hearing to support their argument and both testified that placing Sarah at Lafayette where, at the most, one other child would be attending in December 1987, and giving Sarah access to other children intermittently, such as during recess or special trips, would not meet Sarah's socialization requirements. AR at 104–09, 160–64. DCPS failed to rebut this testimony and, therefore, the hearing officer erroneously determined that "Sarah's need to socialize and interact can be met in a small group ... [and that] Sarah will receive her larger group experience during recess, lunch, assemblies, trips and other special events." AR Exh. C at 6–7. Accordingly, the hearing officer's determination is reversed on this issue.

**26.** DCPS has offered the Court no alternative but to address the appropriateness of Ivymount since Dr. Woods testified that he would continue to recommend that DCPS students whose IEPs require OT be placed in DCPS schools even though he is aware of DHS's inability to provide OT services, Tr. at 475, and since Dr. Humphrey testified that "[Lafayette] was the very best program DCPS had for Sarah." *Id.* at 526.

**27.** *See id.* at 155–91, 403–17.

**28.** *Id.* at 155–56.

funding at the expense of the District of Columbia.[29]  Currently, twenty-eight DCPS children attend Ivymount; of the seven children newly enrolled during the 1987–88 school year, six were placed there as the result of a DCPS hearing officer's determination.[30]

In the usual case, this matter would be remanded for an administrative hearing on the appropriateness of Ivymount because the parents had not proffered Ivymount as their unilateral choice at the time of the administrative process.  This is not, however, the usual case.  Only scant weeks (three or four) remain before the commencement of the school year for Sarah, a place has been reserved for her at Ivymount pending this Court's decision, and DCPS has failed to propose and produce any appropriate placement for her for the upcoming school year.  The District of Columbia has been afforded opportunity to present its witnesses to challenge Ivymount or, by cross-examination, to cast doubt upon its appropriateness.  It has not done so.  In addition, DCPS's continued insistence that Lafayette could provide the services required by Sarah's IEP is unsupportable.  In consideration of the unchallenged evidence at the hearing demonstrating the appropriateness of Ivymount, it would not only be futile, but manifestly unjust, to create another substantial delay in this young child's education by remanding this matter to the administrative hearing process for a determination regarding a new placement for Sarah for the imminent school term.  *See, e.g., Doe v. Maher*, 793 F.2d 1470, 1490–91 (9th Cir.1986) (exhaustion not required where administrative relief would be futile or inadequate), *aff'd on other grounds sub nom. Honig v. Doe*, 479 U.S. 1084, 107 S.Ct. 1284, 94 L.Ed.2d 142 (1987); *Monahan v. State of Nebraska*, 645 F.2d 592, 599 (8th Cir.1981) (exhaustion of administrative remedies not required

where present school year was far advanced and second hearing would only cause additional expense and delay), *cert. denied sub nom. Rose v. Nebraska*, 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983); *Parks v. Pavkovic*, 536 F.Supp. 296, 302 (N.D.Ill.1982) (exhaustion of administrative remedies not required when their pursuit would be futile or meaningless as a practical matter).  Moreover, in this case, plaintiffs exhausted their administrative remedies before seeking relief.  *See Holmes v. District of Columbia*, 680 F.Supp. 40, 43 (D.D.C.1988) ("[plaintiffs] cannot be required to initiate a new administrative process for each school year, when they are actually in the middle of an ongoing proceeding").  In such exceptional circumstances, it is appropriate, without further hearing, to direct that the DCPS fund Sarah at Ivymount for the 1988–89 school year.[31]

■ Plaintiffs also request that DCPS be prohibited from changing Sarah's placement for two years without her parents' consent.  Despite the relief granted in this case, this specific request shall be denied because EHA requires DCPS to review annually a child's IEP.[32]  Within the next year, DCPS may be able to responsibly and timely institute an appropriate integrated OT program for Sarah at one of its preschool programs, or may determine that continued placement at Ivymount is appropriate under all circumstances then existing.

## C.  Hearing Officer Hochauser

■ Plaintiffs allege that the hearing officer, Lois Hochauser, violated EHA by displaying bias in favor of defendants in her conduct at the February 8, 1988 administrative hearing and in her final determination.[33]  Plaintiffs assert that the hearing officer was "openly belligerent, prevented

---

**29.**  *See id.* at 411–15.

**30.**  *Id.* at 415.

**31.**  EHA provides a district court with broad authority to "grant such relief as [it] determines is appropriate."  20 U.S.C. § 1415(e)(2).

**32.**  *See* 20 U.S.C. § 1413(a)(11).  The Court does not have the authority to bind DCPS's hands at this juncture; the agency must be provided the opportunity to remedy its past errors.

**33.**  20 U.S.C. § 1415(b)(2) provides that "the parents or guardian shall have an opportunity for

plaintiffs from cross-examining defendants' witnesses ... [and] assisted defendants' witnesses in formulating their answers." [34] Plaintiffs' contentions, however, do not amount to the "substantial showing of personal bias" that is "required to disqualify a hearing officer or to obtain a ruling that the hearing is unfair." *Roberts v. Morten*, 549 F.2d 158, 164 (10th Cir.1976), *cert. denied sub nom. Roberts v. Andrus*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). Although the record indicates that the hearing officer conducted at least part of the proceedings in a somewhat abrupt manner, there is no evidence of personal bias. It must be noted that some of her rulings favored the plaintiffs and an adverse ruling does not connote bias.[35] Plaintiffs' request to enjoin Hearing Officer Lois Hochauser from participating in any future hearings concerning Sarah Kattan is therefore denied.

D. *Reimbursement for Expert Testimony, and Attorneys' Fees and Costs*

■ Plaintiffs request that defendants reimburse them for the costs incurred in securing expert testimony at the February 8, 1988 hearing (Count IX) and the costs of bringing this action. Under EHA, a court may award reasonable attorneys' fees and costs to a prevailing party.[36] Finding that the hearing officer's determination concerning the appropriateness of Lafayette for the 1987–88 school year was erroneous and that Sarah should be placed at Ivymount, plaintiffs' request for reasonable attorneys' fees and costs associated with this action will be granted in an amount to be determined through subsequent filings, as necessary. The parties shall further brief, in accordance with the schedule below, whether expert witness fees are reimbursable as "costs" under the statute. The parties are strongly encouraged to resolve,

without further litigation, these issues, as well as plaintiffs' recently renewed motion for sanctions. To provide a reasonable opportunity to settle these issues, further briefing shall be scheduled as ordered below. As a result, defendants' August 8, 1988 motion for enlargement of time to respond to the sanctions' motion is moot.

III. *Conclusion*

Accordingly, for the reasons set forth above, after full and careful consideration of the entire record, it is hereby

ORDERED that the hearing officer's determination that Lafayette was an appropriate placement for Sarah Kattan for the 1987–88 school year is reversed; it is

FURTHER ORDERED that defendants shall promptly place and thereafter fund Sarah Kattan at Ivymount School, Rockville, Maryland, for the 1988–89 school year and furnish such related services as are reasonably required, including transportation to and from Ivymount; it is

FURTHER ORDERED that defendants, within 30 days of this Order, reimburse plaintiffs the sum of $1,580.00 advanced to Ivymount to assure placement for the 1988–89 school year; it is

FURTHER ORDERED that defendants, within 30 days after their receipt from plaintiffs of all vouchers for these purposes, reimburse plaintiffs that sum representing the total incurred by plaintiffs for speech therapy and occupational therapy for Sarah Kattan since June 1, 1988 to date of this Order; it is

FURTHER ORDERED that plaintiffs' request that Hearing Officer Lois Hochauser be precluded from participating in any future administrative hearing concerning Sarah Kattan is denied; it is

FURTHER ORDERED that plaintiffs' request that the minor plaintiff's educational placement not be changed without ex-

---

an impartial due process hearing which shall be conducted by the State educational agency."

**34.** Plaintiffs' Revised Memorandum at 31–32.

**35.** Notably Jesse Porter, a DCPS employee, testified that "the overwhelming majority of the cases [Hochauser] has heard before our office have gone in favor of the parents." Tr. at 143.

**36.** 20 U.S.C. § 1415(e)(4)(B) provides that "[i]n any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents ... of a handicapped child ... who is the prevailing party."

press consent of her parents for a period of two years is denied; it is

FURTHER ORDERED that plaintiffs' request for reimbursement of attorneys' fees and costs related to this action is granted; save for the matter of witness fees, to be further briefed; and it is

FURTHER ORDERED that absent settlement by September 1, 1988, of attorneys' fees, costs, and witness fees, and the motion for sanctions, plaintiffs shall submit their requests for attorneys' fees, costs, and witness fees, fully documented and supported with legal citation, on or before September 20, 1988; opposition thereto shall be filed October 6, 1988; reply, if any, by October 12, 1988. Defendants' opposition to plaintiffs' motion for sanctions shall be filed no later than September 20, 1988; reply, if any, September 28, 1988.

This action stands dismissed. A separate Judgment accompanies this Memorandum Opinion.

IT IS SO ORDERED.

### JUDGMENT

As set forth in the Memorandum Opinion issued this date, judgment is hereby entered in favor of plaintiffs Sarah Kattan, Susan J. Thomas and Joseph Kattan, and against defendants District of Columbia, Andrew E. Jenkins, III, Doris Woodson, and Paul Woods.