Elizabeth **BRIERE**, a minor By and Through her mother as next friend, Lorraine **BROWN**, and Lorraine Brown, Plaintiffs,

v.

**FAIR HAVEN GRADE SCHOOL DISTRICT, Fair Haven Town School Board, Fair Haven Union High School District No. 16, Fair Haven U.H.S.D. No. 16 Board, and Addison–Rutland Supervisory Union, Defendants.**

**Civil Action 2:93cv138.**

United States District Court, D. Vermont.

Dec. 18, 1996.

---

Olcott Whitman Smith, Kochman & Smith, Burlington, VT, for plaintiffs.

Charles Norman Hurt, Jr., Downs, Rachlin & Martin, St. Johnsbury Offices, St. Johnsbury, VT, Richard Alden Pearson, Rutland, VT, for defendants.

## OPINION AND ORDER

SESSIONS, District Judge.

This is an appeal brought by Lorraine Brown on behalf of her daughter, Elizabeth Briere, and herself of an administrative due process hearing decision denying her petition to require Defendants to reimburse her for tuition payments at Maplebrook School from September 1992 to June 1995, together with reasonable attorneys' fees. Jurisdiction is based on 20 U.S.C. § 1415(e)(2) (1990) and Vt.Stat.Ann. tit. 16 § 2957 (1989). The Court has reviewed the record of the due process hearing, together with the decision of the hearing officer. The Court also considered additional evidence elicited at trial, which commenced on September 4, 1996. Based upon that review, the Court hereby reverses the hearing officer's decision and enters judgment in favor of Plaintiffs.

## FINDINGS OF FACT

Elizabeth ("Betsy") Briere was born on October 6, 1975. She resides with her mother, Lorraine Brown, in Fair Haven, Vermont. The Fair Haven Probate Court granted Mrs. Brown full guardianship over Betsy with respect to all major areas of living. When Betsy turned eighteen, both Mrs. Brown and her son became Betsy's guardians.

Betsy has a number of serious learning disabilities. Her I.Q. scores range between 64 and 74, putting her in the mildly mentally retarded-to-borderline category. She has a severe global language disorder affecting both expressive and receptive language functioning. She processes information very slowly. She is extraordinarily shy and reserved, and has difficulty socializing with others. She has a severe memory impairment, affecting primarily her short-term memory. Betsy also has a number of physical disabilities. She has a sight impairment and is legally blind in one eye. She has a congenital heart murmur from birth and tires easily.

Betsy has been eligible for special education services under the Individuals with Disabilities Act ("IDEA") since her enrollment in pre-school. For the first nine years of her education, Betsy was educated in self-contained classes at the Vermont Achievement Center and the Castleton Area Program. These programs served students with disabilities exclusively. The placements were consistent with her Individual Education Program ("IEP").

In 1987, Betsy underwent a comprehensive evaluation at the Newington Children's Hospital. The Hospital's evaluation summary noted that her achievement levels in all subjects were at the first or second percentiles. The report also noted a neurological impairment, limited motor and social skills, and a "severe expressive and receptive language disorder." Administrative Hearing Exhibits: Parents' L at 2–3 and Parents' J at 4. The report recommended that she participate in full-time, special education programming, using a language-based curriculum. Those observations were confirmed in a subsequent evaluation at Newington Children's Hospital in 1990.

The local school district completed a speech and language evaluation of Betsy on April 10, 1990. The evaluation determined that she was eligible to continue speech/language services, and recommended that those services focus on vocabulary, expressive, and receptive language skills.

Betsy was also tested at the Stern Center for Language and Learning in 1993. Again, she scored below the first percentile in all language assessments. Although Betsy was eighteen years old at the time of the evaluation, her vocabulary level was that of a child of eight years, ten months. The existence of a "severe" language disorder was identified.

During Betsy's fourth grade year, she attended a mainstreamed social studies class in Castleton and spent the remainder of the day in self-contained special education classrooms. In fifth grade, she attended a mainstreamed science class as well. Mrs. Brown was fully in support of Betsy's expanded mainstreamed learning experiences.

By 1990, Betsy and her mother had moved to Fair Haven, Vermont. On March 7, 1990, with the encouragement of Mrs. Brown, Betsy entered a regular sixth grade class at Fair Haven Elementary School. Betsy's teacher had been an instructor at the Vermont Achievement Center, and knew Betsy. A speech and language evaluation was conducted by the school. As a result, Betsy received remediation in vocabulary, expressive, and receptive language skills.

Mrs. Brown is a certified special educator and has provided substantial support in satisfying Betsy's educational needs. She has reviewed and adapted texts, pre-taught difficult concepts and words, and assisted Betsy in completing homework assignments. She coordinated her work with that of Betsy's teachers. She also attended all IEP meetings and fully cooperated with the school's staff. Her work has been invaluable in helping her daughter cope with the rigors of a standard educational curriculum. She continued to work directly with Betsy, adapting tests and tutoring concepts and assignments, until Betsy left the public school. Much of the credit for Betsy's academic achievement is due to Mrs. Brown's exceptional efforts.

Betsy attended the Fair Haven Grade School for the seventh and eighth grades. This junior high school had approximately 100 students and was located in an area of the building separated from the younger students. Junior high school students had the same teachers for each subject for both years. The faculty was small and they met each week to coordinate their programs. There was constant communication among the teachers, both formal and informal. The environment of the junior high school was extremely supportive.

In the seventh grade, pursuant to the terms of her IEP, Betsy had a full-time aide, Maria Hyatt. She also received special education services in the resource room in the areas of reading, writing, and math. She attended mainstreamed classes in the other academic areas, using texts modified by the teachers and Mrs. Brown. Betsy's mother agreed fully with the IEP Team's decision to put Betsy in mainstreamed academic classes with this level of educational support. In the eighth grade, Betsy asked that her aide be reduced to half-time because she was concerned that the presence of an aide was an embarrassment in her social setting. Aside from that modification, her academic program in the eighth grade remained essentially unchanged.

The IEP Team decided on September 10, 1991 to conduct a supplemental evaluation in the area of speech and language. With Mrs. Brown's consent, the Team discontinued speech and language services.

During Betsy's two years at the junior high school, she made progress in a number of areas. Although she remained mostly nonverbal in the classroom, making assessment of her academic progress difficult, her social skills had begun to improve toward the end of her eighth grade year. She also made progress in reading, vocabulary and math, subjects which were taught in the resource room. However, tests administered by the local school district indicated little or no progress in the area of language. In May 1990 the school administered the Clinical Evaluation of Language Fundamentals ("CELF–R") to Betsy, assessing her language in age equivalency at six years, seven months. The same test administered sixteen months later showed no appreciable change in result. A Peabody Picture Vocabulary Test administered in September 1991 put her in the first percentile, indicating no progress in the area of language.

Mrs. Brown expressed concerns in the summer and fall of 1991 to the Team and school administrators about Betsy's ability to thrive in mainstreamed classes in the high school setting. She felt that the complexity of the language used in high school classrooms would be incomprehensible to Betsy. She was also concerned about the pace of instruction, the lack of coordination among teachers, the stigmatizing effects of the use of an individual aide, and the risk that Betsy would be isolated socially. Mrs. Brown requested from the school a list of private schools which could serve Betsy. In February 1992, she and Ms. Hyatt visited Maplebrook School in Armenia, New York. No other possible placements were identified by the school. Betsy and her mother also visited Fair Haven Union High School in March 1992.

On March 12 and April 3, 1992, school personnel from the junior high school and the high school met to discuss future programming for Betsy at the high school. Plans to help Betsy make the transition into mainstreamed classes at the high school with a half-time aide were discussed. A tentative schedule of courses was drafted. The group decided to convene the IEP Team to rewrite the IEP in the spring of 1992. There was no discussion about alternative placements for Betsy. Mrs. Brown attended the April 3rd meeting and vigorously opposed placement at the high school.

On April 6, 1992, Mrs. Brown wrote Gloria Moulton, Assistant Principal of Fair Haven Grade School, to express her objections to Betsy's placement at the high school, and to request that she be allowed to attend Maplebrook School. She formally requested funding for such a placement. The letter was referred to John Everitt, the district's Special Education Coordinator, who forwarded the request to the state Department of Education. Despite the request for residential placement at Maplebrook, the district did not conduct a supplemental evaluation of Betsy prior to the 1992–93 school year.

On May 20, 1992, an IEP meeting was held at the Fair Haven Grade School. Special education teachers and staff from the junior high school and the high school attended. Mrs. Brown also attended. Betsy's IEP Team prepared a draft IEP which provided for Betsy's placement at the high school. Betsy was to attend General Math I, English, science, social studies, physical education, and creative arts. She was to have a study hall in the resource room and the assistance of an aide in four of her courses. She was to receive a total of 1765 minutes in a regular education environment and 200 minutes per week in the resource room. Her annual goals were (1) to increase content-based vocabulary, and (2) to increase reading comprehension skills related to the content areas. Mrs. Brown attempted to discuss placement at Maplebrook during the May 20th IEP Team meeting. Other members of the Team refused to discuss alternative residential placement. Ultimately, Mrs. Brown rejected the IEP drafted at that meeting.

The IEP written at the May 20th Team meeting differed from earlier plans in significant ways. It did not include annual goals and short-term objectives in the areas of math, written expression, social development, and pre-vocational skills. Aside from vocabulary development, no mention was made of annual goals or short-term objectives in the area of language remediation, despite the fact that this is the area of Betsy's most profound disability, nor did the IEP establish a plan for continuing to address her language skills. Unlike Betsy's seventh and eighth grade IEP, there was no individualized program of special education in the area of written expression, language, social or pre-vocational skills development.

Ms. Moulton testified that the May 20th IEP was intended to be vague and rudimentary so that special educators at the high school could adjust the IEP once Betsy had adjusted to the high school. She described the IEP as "transitional." According to Ms. Moulton, transitional IEPs are common within the District.

Mrs. Brown employed Dr. Louisa Cook Moats, Ed.D., to evaluate Betsy and assess the appropriateness of her placement at the high school. Dr. Moats has a doctorate in reading and human development from the Harvard Graduate School of Education. She is also a licensed teacher and psychologist

and has been in a clinical practice for about thirty years. She teaches at Dartmouth College, the University of Vermont and St. Michael's College, and has written extensively about learning disabilities.

Dr. Moats visited Fair Haven Union High School during the 1993–94 school year. She observed classes identified by special educator John Smith to be those which Betsy was to take under the May 20th IEP. She found the courses inappropriate for Betsy for a number of reasons: (1) the concepts and vocabulary used in these courses were too complex; (2) the instructional material was taught much too quickly; (3) the instructional materials were beyond her level of comprehension; and (4) the classes did not utilize a multisensory approach to learning, an approach that was particularly successful for Betsy. She also found that the courses were designed for markedly more advanced students and that the materials could not be rewritten to make the courses comprehensible to Betsy.

Fair Haven Union High School is a regional high school with a student population of 500 and a grade population of 125. There is substantially less effort among the faculty to coordinate programs of individual students than there is at the grade school. Unlike Fair Haven Grade School, teachers do not meet on a weekly basis to review students. Students are unlikely to have the same teacher for two consecutive years. Students are also expected to work more independently than in previous years. The high school did not have a speech language pathologist on staff. It did provide an alternative educational program for students with severe learning disabilities, but Mrs. Brown and the staff agreed that the alternative program was designed for students who functioned at much lower skill levels than Betsy and was not appropriate.

Mrs. Brown petitioned the school district for reimbursement of tuition expenses in her letter of April 6, 1992. She went to the Fair Haven Town School Board Meeting on September 3, 1992 seeking such funding. Her request was denied. Mrs. Brown placed Betsy in the Maplebrook School for the 1992–93

school year. She remained at Maplebrook for three academic school years.

Maplebrook School is a registered high school certified by the New York Board of Regents. Although all of its teachers have been certified as special educators or in their respective disciplines, it has not been approved by the State of New York as a special education facility. It serves slightly fewer than 100 students, most of whom are in residential placement, all of whom have some kind of cognitive or social disability.

At Maplebrook, the curriculum, pace of instruction, teaching styles and support services are all geared towards students with similar educational needs. Instruction varies between classes of eight to ten students and independent tutorials. IEPs are developed for all students. The District's Special Education Coordinator, John Everitt, observed Maplebrook and reported that the school was "excellent" and "was not lacking anything." He also observed that Betsy's program at Maplebrook was well designed and integrated into the design of the school and was appropriate to meet her needs.

Betsy's IEP at Maplebrook was extensive and covered both academic and social goals. She received specialized programs in reading, English, language therapy skills and math. Goals were established for improvements in socialization. Betsy thrived at the school. She progressed academically, including making improvements in her language skills. She became more self-confident and assertive in her social dealings with others.

Based upon personal observations of instruction at Maplebrook as well as review of the IEPs and test results, Dr. Moats testified that Maplebrook offered Betsy an appropriate education. Her IEPs addressed needed skill areas, including language, reading, written expression, math, and socialization. Course content was often individualized and was suited to Betsy's level of learning. Dr. Orna Lenchner of the Stern Center concurred with this assessment.

Residential programs provide a setting for improving social skills in a structured and supportive environment. That is particularly important for students like Betsy who do not

initiate social contacts when living independently. Betsy also has had difficulty in maintaining appropriate standards of personal hygiene and diet without prompting, and structured residential programs can provide that constant attention.

Dr. Moats found that Betsy's educational and social disabilities could have been met in a structured, nonresidential program, provided that it offered instruction geared toward addressing her needs. However, such a program did not exist within driving distance from Mrs. Brown's home. No appropriate alternatives were proposed by the school district, nor were any of the expert witnesses aware of any such programs either in Vermont or within reasonable driving distance of Fair Haven. Daily commuting to Maplebrook was impractical.

On October 5, 1992, Mrs. Brown requested a due process hearing by writing to the Vermont Department of Education. A two-day hearing was held in Fair Haven, Vermont, on January 8 and 11, 1993. By agreement of the parties, both sides waived the assistance of counsel. Mrs. Brown did not testify at the hearing, nor did the hearing officer explain her right to so testify. The hearing officer issued findings and an order rejecting her appeal on February 9, 1993. The hearing officer found that Maplebrook School was not an approved special education facility in New York or Vermont and, as a result, could not be the recipient of tuition payments. Further, the hearing officer's opinion did not address numerous procedural issues. Mrs. Brown appealed his decision.

The hearing officer also ordered a re-evaluation of Betsy's placement. On March 24, 1993, the IEP Team developed plans for this re-evaluation, to include testing by the Stern Center for Language and Learning; a review of records conducted by EDCS, Inc.; neurological testing by Dorie Rapp, Ph.D.; and an occupational therapy evaluation. Significant delays in completing the re-evaluation occurred. Betsy returned to Maplebrook for the 1993–94 school year. Finally, the Team met on January 3, 1994 to review the test results.

Reports from the Stern Center revealed the severity of Betsy's language disorder.

According to Dr. Lenchner, Betsy scored below the first percentile in receptive and expressive language and vocabulary skills. Similar tests had been conducted six years ago at the Newington Children's Center, and Dr. Lenchner found little progress. Dr. Lenchner concluded that Betsy had a severe language disorder for which she needed special education services. Based principally upon these findings, the Team found that Betsy was eligible for special education services and recommended that those services focus upon vocational and independent living skills, and incorporate academic and social skills.

The IEP Team failed to meet to draft an IEP for Betsy for academic year 1993–94. They met on April 6, 1994, and August 1, 1994, to consider the Team's recommendations and to draft an IEP for 1994–95. Mrs. Brown requested that an IEP be developed at those meetings. During the August 1st meeting, a draft IEP was prepared but not approved. Another meeting was to be held after school personnel had gathered additional information relating to goals and objectives. No hearing was held prior to Betsy's re-enrollment at Maplebrook for academic year 1994–95.

The draft IEP at the August 1st meeting focused upon Betsy's vocational needs. It failed to address her educational needs, including individualized programs of special education with goals and objectives in the areas of language, reading, written expression and math. The draft called for a part-time educational program of only 850 minutes per week. Both Dr. Moats and Dr. Lenchner found the draft IEP to be inappropriate because it failed to address Betsy's academic needs. The draft was never formally adopted by the IEP Team.

The IEP Team met on April 27, 1995 to develop a plan for the 1995–96 school year. An IEP was drafted on that day and amended on July 17, 1995, calling for placement at the BOCES program through the Granville Central High School in Granville, New York. The program offered special education services by integrating and applying academic skills to employment settings. The IEP was

acceptable to all parties, and Betsy enrolled in the BOCES program for 1995–96.

Tuition payments at Maplebrook School were: $25,900 for the 1992–93 school year, $26,900 for the 1993–94 school year, and $27,900 for the 1994–95 school year. These figures included residential expenses. The average cost of all publicly funded residential placements as of July 1994 for Vermont students in the custody of their parents was $40,200. 1994 data indicated that the average cost of such placements ranged from approximately $28,000 for students with a specific learning disability to over $65,000 for learning impaired youths. As of 1995, the Vermont Department of Education funded the placement of fifteen students in unapproved schools at an average cost of $37,400.

Mrs. Brown incurred $400 in transportation costs for each of the three school years in question. She also paid $295 for textbooks for the entire three year period. She has incurred extensive legal bills as a result of this litigation.

## CONCLUSIONS OF LAW

### I. *Statutory Framework*

The Individuals with Disabilities Education Act [1], 20 U.S.C. § 1401–1491 (1990 and Supp. 1996), is a comprehensive scheme designed to help states meet the educational needs of children with disabilities, and it establishes

1. The present short title of the IDEA is the result of a statutory amendment effective October 1, 1990. The Act was formerly known as the Education of the Handicapped Act or the Education of All Handicapped Children Act. *See* 20 U.S.C. § 1400 (Supp.1996).

2. The specific components of an IEP are set forth at 20 U.S.C. § 1401(a)(20):

The term 'individualized education program' means a written statement for each child with a disability developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include—
(A) a statement of the present levels of educational performance of such child,

an enforceable substantive right to a "free appropriate public education." *Mrs. W. v. Tirozzi*, 832 F.2d 748, 750 (2d Cir.1987) (citing 20 U.S.C. § 1400(c)). IDEA mandates that parents, teachers, and representatives of local education agencies become involved in developing Individualized Education Programs (IEPs) for students with disabilities. 20 U.S.C. § 1401(a)(20)(F); § 1414(a)(5). Numerous procedural requirements must be followed in drafting and implementing the IEPs, including providing notice to parents of hearings, decisions, and annual reviews. 20 U.S.C. § 1415.

IDEA requires that parents be afforded the opportunity to be involved in the educational planning process. A student's IEP must be developed with the participation and input of the student's family, faculty and evaluators. 34 C.F.R. § 300.344 (1996); § 300.345(a)(2) (1996); Vt.Special Educ. Rule 2364 (1992). The IEP must identify the educational level of the student and include a statement of educational goals and objectives for the student and of the extent to which the student will be able to participate in the regular educational program.[2]

The Supreme Court has emphasized the significance of strict adherence to procedures set out in IDEA in *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982):

(B) a statement of annual goals, including short-term instructional objectives,
(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,
(D) a statement of the needed transitional services for students beginning no later than age 16 and annually thereafter (and, when determined appropriate for the individual, beginning at age 14 or younger), including, when appropriate, a statement of the interagency reponsibilities [sic] or linkages (or both) before the student leaves the school setting,
(E) the projected date for initiation and anticipated duration of such services, and
(F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
*See also* 34 C.F.R. § 300.346 (1996); Vt.Special Educ. Rule 2363.3.

[W]e think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard.

458 U.S. at 205–206, 102 S.Ct. at 3050 (citation omitted). These procedures are designed to ensure "the participation of the parents in developing the child's educational program and assessing its effectiveness." *School Comm. v. Department of Educ.*, 471 U.S. 359, 368, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). *See Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 147 (2d Cir.1983), *cert. denied*, 465 U.S. 1071, 104 S.Ct. 1426, 79 L.Ed.2d 750 (1984) (purpose of procedures is to open channels of communication between parents and school administrators to develop appropriate program for each child).

Parents may bring complaints about any matter relating to the child's placement. 20 U.S.C. § 1415(b)(1)(E). Such complaints are reviewed at an impartial due process hearing conducted by the state or local education agency. 20 U.S.C. § 1415(b)(2). If a hearing is conducted at the local level, an appeal may be taken to the state agency. 20 U.S.C. § 1415(c). An aggrieved party may finally appeal the agency's decision in federal or state court. 20 U.S.C. § 1415(e)(2).

## II. *Standard of Review*

The standard of review of agency decisions under IDEA is set forth at 20 U.S.C. § 1415(e)(2). The Court is to receive and review the records of the administrative proceeding and shall hear additional evidence at the request of a party. The decision is based on the preponderance of the evidence. The Court is to grant such relief as it deems appropriate, and its judgment is to be made independent of the administrative findings.

However, the Supreme Court has recognized that courts do not have special expertise in the field of educational policy and should not substitute their judgment for those of the school authorities. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050–51. Due weight is to be afforded administrative proceedings. *Id. See also Briggs v. Board of Educ.*, 882 F.2d 688, 693 (2d Cir.1989); *Board of Educ. v. Illinois State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir.1994).

Less weight must be accorded an administrative decision, however, where a change in the law affecting the decision occurs after the hearing. *See e.g., Shirk v. District of Columbia*, 756 F.Supp. 31, 32 (D.D.C.1991) (to be upheld, hearing officer's decision must be legally justifiable). At the time of the due process hearing in this case, the Second Circuit explicitly barred recovery of tuition expenses under IDEA by a parent who placed a child in a private school not approved for special education placements. *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567–68 (2d Cir.1989); *Antkowiak v. Ambach*, 838 F.2d 635, 640 (2d Cir.), *cert. denied sub nom. Doe v. Sobol*, 488 U.S. 850, 109 S.Ct. 133, 102 L.Ed.2d 105 (1988). The Supreme Court rejected that position in *Florence County School District Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). The Court in *Carter* specifically upheld tuition reimbursement when a parent placed a disabled child in an unapproved school after the local school district failed to offer her an appropriate program. 510 U.S. at 8–10, 114 S.Ct. at 363.

## III. *Discussion*

The Supreme Court defined the process by which lower courts were to determine whether school districts have complied with the Individuals with Disabilities Education Act in *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051:

[A] court's inquiry in suits brought under 1415(e)(2) is twofold. First, has the State complied with procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations

imposed by Congress and the courts can require no more.

*See also Briggs,* 882 F.2d at 693.

IDEA mandates that states provide a "free appropriate public education" for all children with disabilities. 20 U.S.C. § 1412(2)(B). The Supreme Court has concluded that compliance with IDEA requires "specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley,* 458 U.S. at 201, 102 S.Ct. at 3048. This requirement is satisfied when the education is "sufficient to confer some educational benefit upon the handicapped child." *Id.,* at 200, 102 S.Ct. at 3048. It is not necessary that the state provide the best possible education for all students, but merely an education which is likely to produce meaningful progress. *Board of Educ. v. Diamond,* 808 F.2d 987, 991 (3d Cir.1986); *Norris v. Massachusetts Dept. of Educ.,* 529 F.Supp. 759, 767 (D.Mass.1981).

■ However, more than minimal educational benefit is necessary to comply with IDEA. *Oberti v. Bd. of Educ.,* 995 F.2d 1204, 1213 (3rd Cir.1993). "[C]learly, Congress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic advancement, no matter how trivial." *Carter v. Florence County Sch. Dist. Four,* 950 F.2d 156, 160 (4th Cir.1991), *aff'd,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (quoting *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 636 (4th Cir.1985)).

The Supreme Court addressed tuition reimbursement in *Carter,* holding that parents who unilaterally place their children in private schools and seek reimbursement under IDEA must prove that "the public placement violated IDEA, and that the private school placement was proper under the Act." 510 U.S. at 15, 114 S.Ct. at 366. The Court went on to say that total reimbursement would be inappropriate if the cost of private placement was unreasonable. *Id.*

Mrs. Brown raised several objections to the process by which Betsy's IEPs were developed and her tuition reimbursement request refused for school years 1992–93, 1993–94, and 1994–95.

## A. *Procedural Objections*

The Supreme Court in *Rowley* directed courts to turn first to procedural issues in determining if a disabled child has been afforded a "free appropriate public education." 458 U.S. at 206–07.

### 1. *1992–93 School Year*

Several meetings addressing Betsy's educational plans were conducted in spring, 1992. Members of the junior and senior high school staff met in March, followed by a meeting among those staff members with Mrs. Brown on April 3rd. The staff informed Mrs. Brown that plans were being developed for Betsy's enrollment at the high school. The IEP Team met on May 20, 1992, and drafted and approved Betsy's IEP. The Team informed Mrs. Brown that her request for Betsy's placement at Maplebrook School would not be discussed.

■ Mrs. Brown contends that the District failed to conduct a supplemental evaluation[3] of Betsy after Mrs. Brown requested that she be placed at Maplebrook, that it failed to provide her with adequate notice of her procedural rights under the IDEA and of its refusal to change her daughter's placement, and that it did not follow the IEP process. The District argues as a threshold matter that Mrs. Brown failed to exhaust her administrative remedies as required by IDEA, by neglecting to bring the failure to conduct a supplemental evaluation to the attention of the hearing officer.

**3.** Vermont Department of Education Special Education Rule 2362.2.8 (1992) states, in pertinent part:
A Supplemental Evaluation is a type of comprehensive re-evaluation that shall be conducted by a Basic Staffing Team whenever a responsible agency or a parent proposes to significantly change a student's IEP placement. The purpose of a Supplemental Evaluation is to gather information to assist the IEP participants in their consideration of the proposed significant change in placement.

*Exhaustion*

Before seeking judicial review, persons claiming to be aggrieved by procedural violations must exhaust their administrative remedies. *Garro v. Connecticut*, 23 F.3d 734, 737 (2d Cir.1994). Exhaustion is not an inflexible rule, however. *Mrs. W.*, 832 F.2d at 756. Exhaustion is not required, for example, where resort to the administrative process would be futile, or where adequate relief would not be available in the administrative forum. *Garro*, 23 F.3d at 737; *Mason v. Schenectady City Sch. Dist.*, 879 F.Supp. 215, 218 (N.D.N.Y.1993).

■ Mrs. Brown was not represented by counsel at the due process hearing. She was not told that her request for alternative placement at Maplebrook triggered a right to a supplemental evaluation under Vermont regulations.[4]

■ Schools have an affirmative responsibility to inform parents of their procedural rights under the IDEA. 20 U.S.C. § 1415(b)(1)(D); *Cain v. Yukon Pub. Schools*, 775 F.2d 15 (10th Cir.1985). A child's entitlement to a free appropriate public education should not depend on the extent of a parent's knowledge of the IDEA's requirements. Where a parent is unrepresented and does not have notice of his or her rights under the IDEA, failure to raise a procedural violation at the due process hearing may not bar judicial consideration of that violation. *See Heldman v. Sobol*, 962 F.2d 148, 158–59, n. 11 (2d Cir.1992) (exhaustion not required, according to one of the sponsors of the Act, when an agency has abridged or denied procedural rights); *Mason*, 879 F.Supp. at 219 (citing *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 147 (2d Cir.1983)); *Vander Malle v. Ambach*, 667 F.Supp. 1015, 1030–1031 (S.D.N.Y.1987) (implying that failure to notify of administrative procedures would excuse failure to exhaust).

■ The District's failure to afford Mrs. Brown an opportunity to take advantage of a procedural safeguard is an adequate reason for her not exhausting or even pursuing administrative remedies on this issue. Turning to the procedural deficiencies themselves, the Court finds that the procedures followed by the District violated several provisions of the IDEA, section 504 of the Rehabilitation Act, and federal and state regulations. When viewed as a whole, the procedural violations constituted a flagrant refusal to consider an involved and knowledgeable parent's placement proposal.

*Supplemental Evaluation*

Vermont regulations require a local educational agency to conduct supplemental evaluations of a child "whenever a responsible agency or a parent proposes to significantly change a student's IEP placement." Vt.Special Educ. Rule 2362.2.8(2). In connection with the supplemental evaluation, the local agency must convene a specific designated team to review the last comprehensive evaluation, develop an evaluation plan, and issue a report before the IEP is prepared. Vt.Special Educ. Rule 2362.2.8(2)(a)–(e). Mrs. Brown's proposal for Betsy's placement at Maplebrook School triggered the requirement that a supplemental evaluation be conducted. No such evaluation took place prior to the adoption of the IEP at the May 20th meeting. The Court does not consider the failure to conduct a supplemental evaluation alone sufficient to justify finding that Betsy has been denied a free appropriate public education. The Court may and does, however, weigh this violation along with the other procedural deficiencies cited.

*Notice*

The IDEA and § 504 require that parents receive notice of the IEP Team's decisions. Advance notice must be given to parents whenever a local school district develops or revises an IEP. 20 U.S.C. § 1415(b)(1)(C); 34 C.F.R. § 300.504(a); 34 C.F.R. § 104.36. That notice must explain the proposed ac-

---

4. State procedures, such as are set forth in the Vermont Special Education Rules, which are consistent with the terms of the IDEA and which protect more rigorously the rights of children with disabilities and their parents are fully enforceable under IDEA. *Antkowiak*, 838 F.2d at 641; *Murphy v. Timberlane Regional Sch. Dist.*, 22 F.3d 1186, 1196 (1st Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994); *Geis v. Board of Educ.*, 774 F.2d 575, 581 (3d Cir.1985).

tions and supporting reasons. 34 C.F.R. § 300.505(a)(2).

The importance of compliance with the notice requirements of the Act was addressed by this Court in *Beede v. Town of Washington School District,* 18 Individuals with Disabilities Educ.L.Rep. 1295, 1297 (D.Vt.1992): "[t]he IDEA's notice requirements are part of a series of elaborate and highly specific procedural safeguards that lie at the heart of the Act, and violations of these requirements should not be disregarded casually." The District failed to provide adequate notice of its refusal to consider Mrs. Brown's request for Betsy's placement at Maplebrook School.

### *Failure to Follow IEP Process*

Parents are to have "an opportunity for meaningful input into all decisions affecting their child's education." *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 598, 98 L.Ed.2d 686 (1988). Mrs. Brown had a long history of involvement in her daughter's education. After Mrs. Brown learned that administrators had made tentative educational plans for Betsy in Mrs. Brown's absence, she asked the IEP Team to consider Maplebrook. The Team refused to discuss the option or to explain the reasons for their refusal. The District's development of plans in the absence of Mrs. Brown in March, 1992 and the Team's refusal to consider Maplebrook at the May 20th IEP Team meeting inhibited meaningful parental involvement and contravened the letter and the spirit of the statute.

### 2. *1993–94 School Year*

■ Under 20 U.S.C. § 1414(a)(5), local educational agencies must conduct annual reviews of IEPs of disabled students.[5] There is a concomitant obligation to review placement of children with disabilities annually. 34 C.F.R. § 300.552(a)(1). The fact that the parties were in litigation during the 1993–94 school year did not relieve the District of its obligation to comply with the IDEA. *Delaware County Intermediate Unit No. 25 v. Martin K.,* 831 F.Supp. 1206, 1223 (E.D.Pa. 1993).

The IEP Team did not meet during the 1993–94 school year, nor was the IEP adopted on May 20, 1992 reviewed or revised. This failure to meet is astonishing in light of the hearing officer's February 9, 1994 directive to the local district to "develop a current IEP providing for placement appropriate for Student ..." Hearing Order, p. 11.

The District relies upon *Beaufort County Schools v. Roach,* 114 N.C.App. 330, 443 S.E.2d 339 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 486, 130 L.Ed.2d 398 (1994) to place responsibility for failure to conduct IEP Team meetings on Mrs. Brown. In *Beaufort,* a mother interrupted an ongoing IEP preparation process and unilaterally placed her child in a private facility, which developed an IEP for her. Under these circumstances, the mother could not object that the local educational agency failed to adopt an IEP, because she caused the failure. The North Carolina court also concluded, however, that the local educational agency remained under an obligation to develop an IEP for the child while the child was in a private placement.

■ Educational agencies are bound to adhere to provisions of the IDEA whether or not the child has been placed in a private or public facility. The IDEA requires special educators and administrators to encourage parental participation. 20 U.S.C. § 1415(b)(1)(A) and (D). Special educators and administrators must ensure compliance with the IDEA. Failure to follow the requirements of the statute constitutes a breach of their responsibilities. This Court refuses to adopt a principle which would in any way shift responsibility for compliance with the IDEA to parents.

### 3. *1994–95 School Year*

There were several procedural violations of the IDEA during the 1994–95 school year. The IEP Team met on April 6 and August 1, 1994, during which a draft IEP was written. The IEP was not adopted at the August 1st meeting, nor did the Team schedule subse-

---

**5.** Federal regulations require that: "[e]ach public agency shall initiate and conduct meetings to review each child's IEP periodically and, if ap-

propriate, revise its provisions. A meeting must be held for this purpose at least once a year." 34 C.F.R. § 300.343(d).

quent meetings to review the draft. Again, the District violated fundamental requirements of the IDEA by never adopting an IEP for Betsy for the school year.

Federal law requires the attendance of several identified persons at IEP Team meetings, including a representative of the educational agency, the child's teachers, the child's parents, and the child, if appropriate. 34 C.F.R. § 300.344(a)(1)–(4). The district is also required to ensure that individuals who are knowledgeable about the child's educational needs contribute to the IEP. In the instant case, none of Betsy's teachers attended the IEP Team meetings. Furthermore, the Team apparently ignored the recommendations of experts who evaluated Betsy in 1993, including those of Dr. Lenchner.

### 4. Conclusion: Procedural Violations

The Court finds that the District committed extensive procedural violations in its attempt to address Betsy's educational needs. The next issue is whether these violations constitute a denial of a free appropriate public education per se, irrespective of whether there has been substantive compliance with the statute.

■ A District's failure to meet the Act's procedural requirements may provide an adequate basis for a finding that the district did not afford the disabled child a free appropriate public education. *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir.1985) (school board's consistent failure to provide notice and inform dyslexic student's parents of procedural rights was adequate ground for finding that student had not been provided free appropriate public education). Such a finding is warranted only if "procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir.1990), *cert. denied,* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).

The district's failure to follow the procedural requirements of the IDEA significantly inhibited meaningful parental participation in the process of drafting and implementing an IEP. District administrators and special educators determined that the high school could provide an appropriate education for Betsy prior to the 1992–93 school year. At the May 20th meeting, team members told Mrs. Brown that Maplebrook School would not be discussed. The District then proceeded to compound its procedural errors by failing to conduct a supplemental evaluation, failing to advise Mrs. Brown of the reasons her placement request was refused, delaying IEP Team meetings for 23 months until April, 1994, and not finalizing an IEP until school year 1995–96. "Congress sought to protect individual children by providing for parental involvement ... in the formulation of the child's individual educational program." *Rowley,* 458 U.S. at 208, 102 S.Ct. at 3052. The violations of the Act committed by the District over the three year period go to the heart of parental participation. The Court finds that such violations constitute a denial of a free appropriate public education per se.

### B. Substantive Violations

Mrs. Brown argued that the District also failed to satisfy *Rowley's* second prong, whether the IEP was reasonably calculated to enable the child to receive educational benefits. In *Rowley,* the Supreme Court interpreted the IDEA's substantive standard as encompassing "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." 458 U.S. at 201, 102 S.Ct. at 3048.

■ Participants in the May 20, 1992 IEP Team meeting described Betsy's individualized education plan as "transitional." They sought to develop a plan that was flexible and subject to change once Betsy had become involved in the educational process at the high school.

At the outset, the IDEA does not authorize "transitional" IEPs. Educational plans for disabled students are the linchpin of the statute. Procedures were instituted so that IEPs could address the educational needs of children in precise detail. "Transitional" IEPs inhibit coordination and planning and

violate the spirit of the statute. Furthermore, in exercising their review function, courts must evaluate IEPs according to the *Rowley* standards, regardless of whether they are "transitional." In this case, the issue before this Court is whether the May 20th IEP is reasonably calculated to provide educational benefits for Betsy, not whether an IEP might have been developed after Betsy's placement at the high school which would have complied with IDEA.

■ The Court concludes that the May 20th IEP was not reasonably calculated to meet Betsy's educational needs. It omitted several annual goals and short-term objectives that had been included in previous IEPs, including support in the areas of math, written expression, social development, and pre-vocational skills. Betsy's most profound disability, in the area of language remediation, was not even mentioned, much less addressed.

The IEP established a plan requiring Betsy to spend most of her school day in mainstream classes. Betsy's recent testing at the Stern Center identified serious language disabilities. Dr. Lenchner concluded, based upon that evaluation, that Betsy could not function successfully in mainstream high school classes. The IEP Team made no effort to consult with Dr. Lenchner, and it ignored the Stern Center's recommendations despite the fact that the evaluation was conducted at the District's request.

Placement at Fair Haven Union High School was inappropriate in May, 1992, for several reasons. Mainstream classes utilize concepts and language which are much more complex than Betsy can handle. Betsy's language skills place her in the bottom one per cent of the population. The pace of a mainstream high school class is much too fast. Furthermore, according to both Dr. Moats and Dr. Lenchner, Betsy needs a multisensory approach to learning, a point that was not addressed in the IEP. Betsy also benefited from an educational program that was coordinated among all of the teachers, such as was offered at the junior high school. There was no such level of coordination among the high school faculty. Students at the high

school are expected to be much more independent in their efforts to learn.

This Court is particularly sensitive not to impose its educational philosophy upon local educational administrators. *Mather v. Hartford Sch. Dist.*, 928 F.Supp. 437, 445 (D.Vt. 1996). However, after observing high school classes that Betsy would have taken, Dr. Moats testified that the language and subject matter was too complex, that the pace of instruction was too rapid, that the courses failed to use multisensory approaches to learning, and that the lack of coordination among teachers and administrators would be harmful. She observed that, due to Betsy's severe language disorder and the increasing disparity in her educational attainment compared with her classmates, she would be "lost" in mainstream high school classes. This Court agrees.

The draft IEP of August 1, 1994 was inappropriate for several reasons. Its most obvious defect was that it was never fully adopted by the Team. The Draft IEP included no statement of present levels of educational performance, no annual goals or short-term objectives, no specific statement of services to be provided and no objective, evaluative criteria in basic academic areas. It failed to address Betsy's severe language disorder. As such, it was not reasonably calculated to provide her with educational benefit.

C. *Appropriateness of Maplebrook School*

■ The IDEA authorizes the use of residential placements to meet the educational needs of disabled children and the court has the authority to order reimbursement to parents, even if they unilaterally place children in private schools. *School Comm. v. Department of Educ.*, 471 U.S. at 369–70, 105 S.Ct. at 2002–03. Parents possess "an equitable right to reimbursement for the cost of providing an appropriate [private] education when a school district has failed to offer a child a [free appropriate public education]." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 428, 130 L.Ed.2d 341 (1994) (citing *School Comm. v. Department of Educ.*, 471

U.S. at 369, 105 S.Ct. at 2002). In addition to showing that the District's plan was inappropriate, Mrs. Brown must prove that the private placement was proper under the IDEA in order to recover reimbursement costs.[6]  *Id.*, at 370, 105 S.Ct. at 2002–03.

The Supreme Court in *Florence County School District Four v. Carter* held that private schools which do not meet the special education standards of the state are not barred from receiving private parental placements. 510 U.S. at 12–14, 114 S.Ct. at 365. Rather, to determine the appropriateness of parental placement, courts must apply the *Rowley* standard, that is, whether the private placement is "reasonably calculated to enable the child to receive educational benefit." 458 U.S. at 207, 102 S.Ct. at 3051. *See also Carter v. Florence County Sch. Dist. Four*, 950 F.2d at 163.

■ Maplebrook School provided Betsy with a structured, individualized, supportive environment in which to learn. The School adopted IEPs which were detailed and addressed Betsy's individualized educational needs. The class sizes were small, permitting individual attention and encouraging Betsy to interact with other students. The pace of the courses was slower, and the vocabulary and course content less complex than high school classes. Betsy benefited both socially and academically. She became more vocal in class and in social settings. She progressed academically. Her sense of self-esteem improved, as did her ability to work independently. Her test scores and teacher reports reflected that progress.

Betsy also benefited from the residential nature of the school. Because the staff was experienced in working with people with Betsy's disabilities, they were able to help her with social interactions and personal hygiene. Although Betsy may not have needed a residential program to address her educational issues, no non-residential alternatives to Maplebrook School were proposed by the District, nor were any such programs known to exist.

Congress has expressed a preference for placing disabled children in mainstream classes. Removal of disabled children from mainstream classrooms is permissible "only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.550(b)(2). When such mainstream classes are not appropriate, the IDEA generally requires that children be placed in least restrictive alternatives. The child also must be placed as close to the child's home as possible. 34 C.F.R. § 300.552(a)(3). The District argued that Maplebrook School was not the least restrictive alternative to mainstream classes and was therefore inappropriate.

■ The IDEA requires that children be placed in the least restrictive alternative among appropriate education environments. An inappropriate, although less restrictive, placement is impermissible. *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d. 687, 695 (3d Cir.1981). Furthermore, application of the least restrictive alternative principle presupposes that there are alternatives from which to choose. The District did not offer Mrs. Brown any alternative placements to Maplebrook School other than the high school. No witnesses were aware of any non-residential programs within reasonable driving distance of Fair Haven. Maplebrook School was the only appropriate alternative.

The Court finds that Betsy's placement at Maplebrook School was reasonably calculated to enable her to receive educational benefit. The Court also finds that Betsy received substantial educational benefits by attending Maplebrook School. Mrs. Brown has satisfied the second prong of the *Rowley* test.

#### D.  *Reasonable Cost*

Finally, Mrs. Brown must prove that the tuition and supplemental costs that she seeks to have reimbursed are "reasonable."

---

6. The Court's authority to order reimbursement for private placements is found at 34 C.F.R. § 300.302, which provides: "[i]f placement in a public or private residential program is neces-

sary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child."

1258

Tuition, room and board costs at Maplebrook School were $25,900 in 1992–93, $26,-900 in 1993–94, and $27,900 in 1994–95. The average cost of all publicly funded residential placements as of July 1994 was $40,200. The average cost to the Vermont Department of Education for placement of students in unapproved schools was $37,400. In light of the services provided by the staff at Maplebrook School and the comparative costs of other residential placements involving Vermont students, the tuition, room and board costs were reasonable.

Mrs. Brown also seeks reimbursement of $400 for transportation costs for each of the three years and $295 for textbooks over the three year period, for a total of $1495. The Court finds these expenses to be reasonable costs incurred as a result of the placement at Maplebrook, and subject to reimbursement. Further, Mrs. Brown seeks reasonable attorneys' fees and costs. Because she is the prevailing party, she is entitled to payment of her reasonable legal fees, expenses, and costs. 20 U.S.C. § 1415(e)(4)(B).

### ORDER

Based upon review of the record below, including the opinion of the hearing officer, documentary evidence introduced at the due process hearing, transcripts of the hearing and the supplemental testimony at trial, the Court hereby reverses the Order of the Hearing Officer dated February 9, 1993, and Orders Judgment in favor of Plaintiffs. The Court specifically finds that Plaintiffs are the prevailing parties and orders that Defendant reimburse Plaintiffs for education costs in the amount of $80,700 and related expenses in the amount of $1495. Defendants shall pay all reasonable attorneys' fees and costs incurred by Plaintiffs. Plaintiff shall submit a summary of fees and costs within 30 days of this Order. Defendants are given 10 days from the submission of those summaries to file any objections.